## SINKO et al. v. SNOW–CRAGGS CORPORATION.

### No. 6832.

Circuit Court of Appeals, Seventh Circuit.

July 7, 1939.

Fred Gerlach and Norman Gerlach, both of Chicago, Ill., for appellant.

Bernard A. Schroeder, George A. Chritton, and Chritton, Wiles, Davies, Hirschl & Dawson, all of Chicago, Ill., for appellees.

Before EVANS, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

■ John Sinko and the Sinko Tool and Manufacturing Co. (hereafter called the "plaintiff" or "Sinko") brought this suit charging the Snow-Craggs Corporation (hereafter called the "defendant" or "Cragg") with the infringement of a design patent and unfair competition. Having acquired jurisdiction of these issues (which were based on substantially the same facts), and properly so, the District Court decreed the patent invalid as an anticipation of the prior art, and determined the unfair competition issue in favor of the plaintiff. See Hurn v. Oursler, 289 U.S. 238, 240, 246, 53 S.Ct. 586, 77 L.Ed. 1148; Armstrong Paint and Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 324, 59 S.Ct. 191, 83 L.Ed. 195. From the decree enjoining the defendant from placing knobs (for steering wheel spinners) on the market which were substantially the same as those of the plaintiff, the defendant prosecutes this appeal.

The complaint charged that Sinko had been marketing the knobs with distinctive markings and color combinations, and that Cragg had copied these markings and color combinations, so as to deceive the public and Sinko customers into believing that they were the knobs of Sinko. There was no other charge of misleading or fraudulent trade practice.

Among other things Sinko and Cragg were organized for the purpose of engaging in the manufacture and sale of auto accessories. The particular accessories in question are knobs, plain and ornamental, which are used either as handles for gear shift levers or as spinner attachments for steering wheels. A spinner enables the driver of an automobile to grasp the knob and to rotate the steering wheel without gripping the rim of the wheel.

Long prior to 1936, and so the record shows, plain knobs, round or fluted, were on the market and in general use. These knobs, used as parts of auto accessories, were identical in shape and size to the knobs in question. It was Sinko's practice to purchase knobs in rough form from the American Catalin Corporation and other molders of Catalin balls, and then to convert the rough balls into finished products by boring, threading, and polishing.

In 1936 Sinko and Cragg were selling plain knobs, round and fluted, to retail dealers of the trade. During 1936 Sinko came out with the jeweled knob, round and fluted, which added to the previous plain knob a colored button or jewel embedded therein and a tiny metal collar or bezel surrounding the jewel. The District Court found, and the evidence is not inconsistent, that the jewel served no utilitarian or structural function except to enhance the beauty of the knob. The record does point out, however, that jewels and bezels were known to the art long prior to 1936 and had been used previously by the trade in connection with automobile cigar lighters and dash-light guards. In this regard, it was Sinko's practice to order the button or jewel from the Automatic Paper Button Company and to make the bezel itself.

Sinko's ornamental knob, attractive and neat, soon pleased the public and created a great demand. Aware of this public demand for jeweled knobs, Cragg in the fall of 1936 decided to satisfy part of the demand. Going first to Sinko, Cragg requested it to supply the jeweled knobs. Disagreeing as to terms and arrangement, Cragg began to make and sell jeweled knobs itself. In the meantime Sinko had taken out a design patent on the jeweled knob, the patent decreed invalid below and not appealed from. Early in 1937 Sinko notified Cragg that its present business conduct infringed the Sinko patent. Thereafter, Cragg omitted the use of the bezel in its manufacture and sale of the ornamental knobs.

Only a casual inspection of the exhibits in the instant case is needed to disclose the fact that Cragg went very far in imitating Sinko's product. Cragg put on the market knobs so resembling Sinko's in details of structure, coloring and ornamentation as to make the two competing articles almost indistinguishable. With several exceptions, the simulation of Sinko's whole article in non-essential as well as essential features was practically complete. This similarity accounted for the two instances where retail dealers in the trade became confused as to the origin of manufacture.

In other words, we have here a case where the second comer imitates the article substantially, in effect producing a facsimile of the first comer's whole article. The reproduction is not a Chinese example,

because the bezel was omitted, the spring beneath the jewel was not inserted, Cragg's corporate name, origin of manufacture and trademark was imprinted on the spinner bracket attachment, and the brackets were dissimilar.

Nor did Cragg make an effort to imitate the packages (in which the knobs were enclosed), Cragg's knobs being enclosed in boxes bearing the notation "Cragg Steering Wheel 'Spinner and Control." Moreover, Cragg did not use the name "Sinko" in any way in advertising or selling. That is to say, this is a case where nothing is involved except the copying of the article itself. This is a case where there are lacking other features unfair in character, such as the simulation of the design on labels, the copying of the form and shape of the container, and the similarity of the appearance, position, and spelling of the trade-marks.

The law of unfair competition stresses business integrity, encourages legitimate trading, and protects good will against spoliation. However, it is not true that all acts done in the trade, which the average-person would describe as unfair, are actionable. "As a manufacturer, one has a perfect right to make any article of commerce not covered by a patent monopoly * * *. As a distributor, however, he must respect those methods of honest and upright dealing which forbid one competitor from adapting practices which are now well understood to be unfair or fraudulent." William H. Keller Inc. v. Chicago Pneumatic Tool Co., 7 Cir., 298 F. 52, 57, certiorari denied, 265 U.S. 593, 44 S.Ct. 637, 68 L.Ed. 1196. The existence of a right of action depends upon the peculiar facts of each case, turning on whether what is done by one person to get the business of another is done unfairly, i. e., by means that involve fraud or deceit.

In other words, equity will protect the honest, and restrain the dishonest, trader. The general rule in these cases has been admirably stated in Enterprise Mfg. Co. v. Landers, 2 Cir., 131 F. 240, 241, in this way:

"* * * a court of equity will not allow a man to palm off his goods as those of another, whether his misrepresentations are made by word of mouth, or, more subtly, by simulating the collocation of details of appearance by which the consuming public has come to recognize the product of his competitor."

That is to say, the doctrine underlying unfair competition cases is to restrain deceitful and fraudulent competition in whatever garb of misrepresented identity it assumes.

In the instant case Sinko, by adding a "nonfunctional" jewel, has produced a knob which is particularly desirable in the eyes of the purchasing public. Since Sinko's design patent on this article has been declared invalid, it follows that he has no right to monopolize, unless the right of exclusion attaches in some other way. An analysis of the unfair competition cases establish the proposition that Sinko's right to monopolize, and consequently Cragg's "right to imitate" (Mr. Justice Holmes, Saxlehner v. Wagner, 216 U.S. 375, 381, 30 S.Ct. 298, 54 L.Ed. 525), therefore depends on whether the particular trade dress in question has acquired a secondary meaning.

Nowhere has the doctrine of secondary meaning and its indispensability in unfair competition cases received more admirable treatment than in Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299, 300, when Judge Learned Hand said:

"The cases of so-called 'nonfunctional' unfair competition * * * are only instances of the doctrine of 'secondary' meaning. All of them presuppose that the appearance of the article * * * has become associated in the public mind with the first comer as manufacturer or source, and, if a second comer imitates the article exactly, that the public will believe his goods have come from the first, and will buy, in part, at least, because of that deception. Therefore it is apparent that it is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person—the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure."

In the instant case, as we shall explain later, the existence of a secondary meaning, or an identification in the public mind coming from the appearance of the jeweled knob, is lacking.

There is no proof that Cragg was palming off its knobs as the merchandise of Sinko, or that the knobs were bought

because they originated with the plaintiff. Viewing the evidence and all the inferences that may properly be drawn therefrom, it only establishes, at best, that Cragg knobs are similar in form and appearance, and we fail to find evidence in this case which would indicate that Sinko had established a reputation among consumers and dealers, whereby the trade dress in question had become associated with the source of supply. As Judge Learned Hand, in the Crescent case, supra, 247 F. at page 300, put it:

"The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward; no degree of imitation of details is actionable in its absence."

The record clearly justifies the conclusion that Sinko did not meet the test prescribed by the law of unfair competition.

In reality, the facts and circumstances in this record lead to the conclusion that no identification of maker with product had been established. Thus, we find that every feature of the Sinko product—the knob, the jewel, and the bracket—was common property in the trade. In particular, the jewel had been extensively used in auto equipment manufactured by others for such a long time that it seems unlikely that the jewel could ever become an indicator of any particular source of manufacture.

In addition, there is neither evidence of large expenditures in advertising the Sinko jewel knob nor evidence that a reasonable length of time had elapsed between the Sinko manufacturing and the Cragg copying to give Sinko a chance to establish identification of article with maker or source. Moreover, it is logical to believe that public curiosity as to the source of supply would be confined to the shape, form, and color of the ornamental knob, and of these the public would largely judge for itself. In this connection a comparison might be drawn to a case involving a drug preparation, where the efficiency of the drug depends largely upon the capacity of the maker. In such a case, as distinguished from the instant case, the purchaser would care more about the personality behind the drug than the drug itself.

Stated in a summary way, Sinko created a desire on the part of the public for one of two things, either for knobs made by Sinko, above all other knob makers, or for knobs made in a particular manner regardless of who made them. If it is the first situation, the law of unfair competition gives Sinko the right to monopolize or to exclude other makers from copying the product. If it is the latter situation, Sinko receives no such right to monopolize, even though he might have been the first one to make the article in the particularly desirable manner. It is unnecessary to repeat that the evidence in the instant case shows that the public demand is for the article, not for the personality.

As stated in Upjohn Co. v. William S. Merrell Chemical Co., 6 Cir., 269 F. 209, 212, certiorari denied 257 U.S. 638, 42 S.Ct. 50, 66 L.Ed. 410, " * * * certain it is that there is no recognized basis of any right to exclude others, save that extent and kind of public sanction which has induced a common identification of maker by product, and that only in this way can a plaintiff claim to have any property rights to be protected." Or, as was stated by Mr. Justice Holmes, then Chief Justice of the Supreme Judicial Court of Massachusetts, in Flagg Mfg. Co. v. Holway, 178 Mass. 83, 59 N.E. 667, at page 667, "The defendant has the right to get the benefit of that [public] desire even if created by the plaintiff. The only thing it has not the right to steal is the good will attaching to the plaintiff's personality, the benefit of the public's desire to have goods made by the plaintiff."

Counsel for plaintiff bases his argument on four cases, namely, Enterprise Mfg. Co. v. Landers, 2 Cir., 131 F. 240; Yale and Towne Mfg. Co. v. Alder, 2 Cir., 154 F. 37; Grier Bros. v. Baldwin, 3 Cir., 219 F. 735; and Bayley & Sons v. Braunstein, D.C., 246 F. 314. We have considered these cases and we find that the law stated therein is not applicable to the instant case. We find that these four cases presuppose that the appearance of the article had a secondary meaning, and had been associated in the public mind with the first comer as a manufacturer or source of supply. This vital element, as we have already explained, is absent in our case.

We realize that requiring a secondary meaning as a condition precedent to relief in these cases often makes the "diligent thief immune, while the one who might hesitate and delay must give up his

454

plunder." We need only refer to Upjohn Co. v. Merrell Chemical Co., supra, for a complete answer to this.

Accordingly, the decree of the District Court is reversed.