**WEST POINT MANUFACTURING COM-
PANY, Defendant-Appellant,**

v.

**DETROIT STAMPING COMPANY,
Plaintiff-Appellee.**

No. 12310.

United States Court of Appeals
Sixth Circuit.

April 26, 1955.

Hugh K. Davidson, Detroit, Mich. (John H. Burke, Detroit, Mich., on the brief), for appellant.

Lloyd M. Forster, Detroit, Mich. (Farley, Forster & Farley, Detroit, Mich., on the brief), for appellee.

Before MARTIN, McALLISTER, and STEWART, Circuit Judges.

McALLISTER, Circuit Judge.

Upon the expiration of appellee's patent for a toggle clamp, a device for clamping parts in industrial production, appellant copied a number of appellee's clamps and prepared to advertise, manu-facture, and sell them to the industry with its own trade-mark affixed in place of appellee's trade-mark.

To forestall such action, appellee filed a complaint, claiming that, although the patent had expired, appellant, under the Lanham Trade-Mark Act of 1946, 15 U.S. C.A. § 1051 et seq., was guilty of unfair competition in copying and manufactur-ing such clamps, and asked that appel-lant be enjoined from advertising, manu-facturing and selling toggle clamps, "confusingly similar in appearance" to appellee's clamps.

Proofs were taken by deposition and by way of answers to interrogatories. From this evidence, it appeared that up-on the expiration of appellee's patent, appellant had exactly copied appellee's clamps, affixing its trade-mark to the clamps in place of appellee's trade-mark; and that appellant had advertised its clamps for sale, displaying in its ad-vertisements an exact copy of appellee's clamps, the likeness of which had been reproduced for such purpose from a pho-tograph of appellee's clamps.

Upon motions by both parties for summary judgment, the district court held that appellant was guilty of unfair competition for the reason that the evi-dence showed that appellant had copied not only the functional, but also the non-functional parts of appellee's patented clamp; that the nonfunctional parts gave appellee's clamp a general appear-ance identifying and distinguishing it as the particular product made by appellee; that because of such general appearance and shape of the clamp, so identified and distinguished, the patented article had attained a special significance, or sec-ondary meaning, as to which appellee was entitled to protection against cop-iers; that, having copied several non-functional parts of appellee's clamp which gave essence to the general ap-pearance by which it was identified and distinguished as having been made by appellee, appellant was guilty of unfair competition; that appellant's trade-mark affixed to the clamps which it made was not sufficient to avoid a probable

"palming off" of appellant's product as that of appellee; that since appellee's product had acquired a secondary meaning and appellant could have made its clamp in a slightly different way while utilizing the patented features, the law required appellant to distinguish its article from that of appellee to the extent that the public would not be misled or confused; and that it was "actionable unfair competition to unnecessarily copy non-functional parts of any article or device which give essence to a general appearance identifying and distinguishing that particular product as associated with a manufacturer whose reputation is of great importance in securing sales." [122 F.Supp. 743] The district court, therefore, adjudged appellant to be guilty of unfair competition, and enjoined it from "advertising, offering for sale, manufacturing and selling toggle clamps confusingly similar in appearance to plaintiff's toggle clamps." From this decision of the district court, appeal was duly taken.

Some time after the filing of the appeal, appellee filed a motion in the district court for an order enforcing the injunction which was, in effect, a petition for an order to show cause why appellant should not be held in contempt of court for violation of the injunction. Upon the hearing of the motion, in a colloquy between the judge and counsel for both parties that extends for one hundred pages of the transcript of the record, appellant attempted to demonstrate to the court that it had made sufficient changes in the appearance of its clamps to avoid disobedience of the court's injunction; and both parties then pointed out the similarities and differences in their clamps as compared to each other, as well as to clamps manufactured by third parties.

The district court severely reprimanded appellant during the course of this hearing, stating that it was prepared to punish it for contempt of court for violation of its injunction. However, appellant pointed out to the court a number of alterations it had made in the clamp subsequent to the issuance of the injunction. When it was stated that appellant, as one instance, had changed the color of its rubber handle from red, which was the color used by the appellee, to white, appellee's counsel proceeded to inform the court of the similarities still existing between the clamps, and called attention to the fact that appellant, instead of copying appellee's claw form of stop, could have used a metal pin for a forward stop in the clamp; that a curve in the contour of appellee's clamp did not have to be imitated; that instead of having two thicknesses of metal for the handle, appellant could have formed a loop metal handle; that in one of the clamps, appellant, instead of a "T" handle, could have used a straight up-and-down handle, or a handle projecting to one side, and a number of other small changes were pointed out to the effect that the patent features could have been availed of by appellant to make a clamp "that is not confusing to the public." In reply to all of the foregoing, appellant submitted that substantially everything in the clamp which it copied was functional rather than nonfunctional, and that it was so admitted in the testimony of appellee's president; and that, further, if appellant adopted the changes in the clamp pointed out by appellee, it would only be copying other forms of appellee's clamps, or infringing on patented clamps of third parties. The trial court seemed impressed by the evidence that appellant could not make the clamps with the patented features unless it duplicated either the clamps in question or other clamps made by appellee— or infringed upon patented features of clamps made by third parties. Furthermore, in considering the testimony of appellee's president that everything about appellee's clamp was "functional to an extent," the court suggested the possibility of reconsideration of its views on a new trial, stating that it might entertain a motion for a new trial and see what

could be done, but that, in the meanwhile, appellant could not manufacture the clamps.

However, in the end, the district court arrived at the view that if appellee could show how appellant could take advantage of all of the patented features of the clamp and, at the same time, make the changes which appellee's counsel had outlined, then appellant would be guilty of unfair competition unless such changes were made. The court thereupon filed supplementary findings of fact in which it set forth that the copying by appellant of all of the details of appellee's clamps (except color of finish) was unnecessary from a functional standpoint; that numerous functionally equivalent, alternative constructions were available for the various clamp elements; that it was unnecessary for appellant to copy the distinctive appearance of appellee's handle with a plastic handle grip, as well as appellee's distinctive claw-shaped forward stop or rear stop ears projecting from the base, or the distinctive curved upper contours of the base elements; that instead, appellant could have employed a handle formed as a continuous open loop or a wooden handle grip; that in place of the claw-shaped forward stop, it could have employed a stop pin, or button welded to the handle elements; that it could have used a rear stop pin instead of the rear stop ears; that in place of the concavely curved upper surfaces of appellee's clamp base, appellant could have employed a convex curve, or any other contour different from appellee; as well as several other small differences. The court further stated that the exact copying of appellee's clamps in appellant's advertising constituted unfair competition. Accordingly, the district court found that appellant had violated the injunction and had thereby incurred the penalties of such violation.

On appeal, it is the primary contention of appellant that upon the expiration of appellee's patent for the clamp in question, there became dedicated to the public the patented article in the identical form in which it had theretofore been produced and marketed by the appellee. Moreover, appellant submits that, by affixing its trade-mark clearly and prominently upon the clamps manufactured by it, and by the prominent display of its name as manufacturer of the clamps in its advertisements, appellant clearly indicated to the public that the clamps were manufactured by it, and were not the product of appellee's manufacture. Furthermore, it is the claim of appellant that, contrary to the findings of the district court, all of the parts of appellee's clamp which it copied were functional; that upon the expiration of appellee's patent, appellant could not have copied the clamp in question other than by making an exact copy, unless it either imitated other forms of the clamp made by appellee or other forms of clamps already protected by patents in the hands of competitors; that it was unreasonable, as a condition of availing itself of appellee's patent clamp, to require appellant to confine itself to forms of clamps other than those made by appellee, or other than those protected by patents in the hands of third parties; and, finally, appellant declares that it has done everything reasonable to avoid copying appellee's clamp, even in unimportant and trivial nonfunctional features such as the device of changing the color of the handle and metal used in the clamp, as well as using a different handle in place of the form used by appellee. Appellant submits that if it is forbidden to manufacture the toggle clamps in the form in which they have been manufactured by appellee during the life of its patent, the result will be to continue appellee's patent monopoly indefinitely beyond the expiration of its patent.

The issues before us for determination, as they appear from a review of the evidence and authorities hereafter to be noted, may be set forth as follows:

(1) Whether, upon the expiration of appellee's patent, appellant had the right to manufacture exact copies of appellee's clamps and sell them to the public;

(2) Whether appellee's clamps had acquired a "secondary meaning" in the

trade, indicating to the public their origin as coming from appellee, and, accordingly, whether the manufacture and sale by the appellant of the exact copies of appellee's clamps misled the public by inducing it to believe that appellant's clamps were made by appellee;

(3) Whether appellant, in affixing its own trade-mark to the clamps which it manufactured and sold, as well as by its methods of advertising, disclosing that it was the maker of the clamps in question, clearly informed the public that the clamps which it made and sold were not clamps made by appellee.

All of the foregoing propositions are variant and particularized statements of the same general question: whether appellant was guilty of palming off its goods as the goods of appellee.

██ It is a fundamental rule applicable to all cases of unfair competition that one man has no right to palm off his goods for sale as the goods of a rival dealer, and that he cannot, therefore, be allowed to use names, letters, or other indicia by which he may induce purchasers to believe that the goods which he is selling are the manufacture of another; and this principle is applicable although no technical trade-mark is used by either. James Heddon's Sons v. Millsite Steel & Wire Works, Inc., 6 Cir., 128 F.2d 6. The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another, and if defendant so conducts its business as not to palm off its goods as those of complainant, the action fails. Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U.S. 118, 25 S.Ct. 609, 49 L.Ed. 972. Where the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out. Rathbone, Sard & Co. v. Champion Steel Range Co., 6 Cir., 189 F. 26, 37 L.R.A.,N.S., 258.

Appellant relies upon the decisions of the Supreme Court in the leading cases of Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118, and Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, both of which appellee contends are clearly distinguishable from the case before us. Accordingly, these adjudications call for examination and comparison.

In Singer Mfg. Co. v. June Mfg. Co., supra, the Supreme Court had occasion to pass upon the question of unfair competition, where, upon the expiration of the patent for the Singer sewing machine, a party not only copied the distinctive style of the machine but also copied and used the name of "Singer" in describing the machine which he manufactured. In its opinion, the Supreme Court was reviewing the opinion and decision of the circuit court in Singer Mfg. Co. v. June Mfg. Co., 41 F. 208; and since the facts in the case, which are most important and pertinent to the instant case, are to be found in the lower court's opinion, we shall outline them in so far as they bear upon the controversy before us: When the patents on the Singer sewing machine expired, defendant, June Manufacturing Company, made and sold sewing machines having substantially the mechanical features and characteristics of the sewing machines made by the Singer Company under its patents, and in appearance and mode of operation like the Singer Company's machines. It also affixed an oval metal plate on the machine with the words, "Improved Singer," in the border, which was similar to an oval plate, of the same size and general appearance, used by the Singer Company on its machines. In the action brought by the Singer Company to restrain such manufacture and sale, the circuit court held that where the manufacturer of a patented machine adopts "a peculiar style or form in which to embody the working mechanism covered by his patents, or any special mode of ornamentation to make the machine attractive and salable, such form of construction and ornamentation, although not strictly essential to the operation of the mechanical device covered by the patents, still becomes a part of the

machine as presented to the world on the expiration of the patents. It goes to the public in the dress and with the features which have been given it by its manufacturer under the patents. It is presumable that an intelligent manufacturer, wishing to secure a large sale for a mechanical device of which he has a monopoly, especially in a machine of the kind under consideration, which has become a part of household furniture, used his best skill and taste as a constructor to make the machine convenient and attractive, so as to give the best possible embodiment of his patented mechanical devices; and * * * this dress, thus given to the machine, becomes a part of it, and the public, when they have the right to use the patent, have the right to use the dress in which the patentee clothed it. Hence any sewing-machine manufactured by another person, after the expiration of the patents, upon the principles covered by the Singer patents, may be a perfect imitation of the machines which the complainant or its predecessors manufactured under their patents. It does not lie in the mouth of the complainant to object to the close imitation or similarity which the defendant's machines may bear to those made by the complainant. * * * [The] claim set up by complainant to the exclusive use of the word 'Singer' as a trade name, and to the exclusive right to the mode of construction, external shape, appearance, and ornamentation adopted by the complainant while the patents were in force for its 'New Family Singer' and 'Medium Singer,' is not well founded, and should not be so held, as a matter of law, upon the proofs in this case." Singer Mfg. Co. v. June Mfg. Co., C.C., 41 F. 208, 213, 214.

On review, the Supreme Court held that the Singer Manufacturing Company had adopted the word, "Singer," as designative of its distinctive style of machines, rather than solely as indicating the origin of manufacture; that the patents which covered the machines had given to the Singer Company a substantial monopoly whereby the name, "Singer," came to

indicate the class and type of machines made by that company; that the name constituted their generic description and conveyed to the public mind the machines made by them; and that on the expiration of the patents, the right to make the patented articles and use this generic name of "Singer" passed to the public with the dedication, resulting from the expiration of the patents. The court declared that, under the above circumstances, when another party availed himself of this public dedication to make the machines and use the generic designation, he could do so in all forms, with the fullest liberty, by affixing the name, "Singer," to the machines and by referring to it in advertisements and by other means, subject only to the condition that the name must be so used as not to deprive others of their rights or to deceive the public, and, therefore, that the name must be accompanied with such indications that the thing manufactured is the work of the one making it, as will unmistakably inform the public of that fact. Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 181, 183, 185, 200, 16 S.Ct. 1002, 41 L.Ed. 118.

It is to be especially noted that the complaint in the lower court had set forth that the June Manufacturing Company, "for the purpose of further availing itself of complainant's (the Singer Company's) reputation and trade name, and of inducing the belief that the machines manufactured and sold by it are manufactured in fact by complainant, * * * makes said machine *in the exact form and size, and with the same shape, outline, ornamentation, and general external appearance, of complainant's machines*". 41 F. at page 209. (Emphasis supplied.) With respect to these specific allegations of the complaint, the Supreme Court said: "It is self-evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property. It is upon this condition that the patent is granted. It follows, as a matter of course, that on the termination of the

patent there passes to the public the right to make the machine in the form in which it was constructed during the patent. *We may therefore dismiss without further comment the complaint as to the form in which the defendant made his machines.*" 163 U.S. at page 185, 16 S.Ct. at page 1008. (Emphasis supplied.)

■ It seems clear, from the decision of the Supreme Court in the above case, that upon the expiration of a patent, a party may manufacture and copy the article patented in the identical shape, form, and appearance in which it was constructed during the existence of the patent; that the only obligation on the copier is to avoid misleading the public into the belief that the article is manufactured by the prior patent owner; and that, in carrying out its obligation to avoid so misleading, it inform the public unmistakably that it is the product of the one making such copy.

Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 113, 83 L.Ed. 73, emphasized the rule laid down by the Supreme Court in the Singer case. That case involved the review of the decision in National Biscuit Co. v. Kellogg Co., 91 F.2d 150, in which the Circuit Court of Appeals for the Third Circuit had declared that the defendant had appropriated not only the name of plaintiff's product, "Shredded Wheat," but also the peculiar pillow-shape of the biscuit which had characterized it for more than forty years, and held defendant guilty of unfair competition in deceiving the public in securing the trade which, in equity and good conscience, belonged to complainant. On review, the Supreme Court held that the appellee had no exclusive right to the use of the term, "Shredded Wheat," as a trade name, for the reason that it was the generic term of the article by which the biscuit, in pillow-shaped form, was generally known to the public, and in passing upon the issue, the court said: "There is no basis here for applying the doctrine of secondary meaning.

The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the plaintiff's factory at Niagara Falls. But to establish a trade name in the term 'shredded wheat' the plaintiff must show more than a subordinate meaning which applies to it. *It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer.* This it has not done. The showing which it has made does not entitle it to the exclusive use of the term shredded wheat but merely entitles it to require that the defendant use reasonable care to inform the public of the source of its product. * * * The plaintiff has not the exclusive right to sell shredded wheat in the form of a pillow-shaped biscuit—the form in which the article became known to the public. That is the form in which shredded wheat was made under the basic patent. The patented machines used were designed to produce only the pillow-shaped biscuits. And a design patent was taken out to cover the pillow-shaped form.[1] Hence, upon expiration of the patents the form, as well as the name, was dedicated to the public. * * * Where an article may be manufactured by all, a particular manufacturer can no more assert exclusive rights in a form in which the public has become accustomed to see the article and which, in the minds of the public, is primarily associated with the article rather than a particular producer, than it can in the case of a name with similar connections in the public mind. Kellogg Company was free to use the pillow-shaped form, subject only to the obligation to identify its product lest it be mistaken for that of the plaintiff." The court held that the name and form of the biscuit were integral parts of the good will of the article; that the Kellogg Company was as free to share in the good will

---

1. The design patent, before its date of expiration, had been, however, declared invalid.

of the article as the plaintiff; and that, in order to share fully in such good will, it must use the name, "Shredded Wheat," as well as the pillow-shape of the biscuit.

■ From the Kellogg case, the conclusion is to be drawn that one who claims that another is guilty of unfair competition in copying his product, must show that the consuming public is primarily concerned in the producer, rather than in the product itself; that upon the expiration of a patent, a copier is as free to share in the good will of the article as the prior patent owner who had built up such good will; and that the only obligation of the copier is to identify its product lest the public be mistaken into believing that it was made by the prior patentee.

■ Much is said in cases of unfair competition, involving the copying of the goods of a competitor, about the "confusion" of the public. In some instances, references to such confusion would seem to imply that if the article copied is identical to the original article, the public, not being able to tell the difference between the two articles, is confused; and that, since the copier is the cause of such confusion, he is accordingly guilty of unfair competition. That is not the law. The confusion for which the copier is held responsible, under the law of unfair competition, is not confusion resulting from the inability on the part of the public to distinguish between similar articles, one of which has been copied from the other. It is rather confusion as to origin, not of goods, which controls on the question of unfair competition; and it is only if there is such relationship or analogy between the goods of a complainant and those of a defendant that ordinary retail purchasers are likely to be deceived as to their origin that there is, in law, unfair competition.

■ The identical imitation of the goods of another does not in itself constitute unfair competition. "The privilege to engage in business and to compete with others implies a privilege to copy or imitate the physical appearance of another's goods. The public interest in competition ordinarily outweighs the interest in securing to a person the rewards of his ingenuity in making his product attractive to purchasers. But the privilege to imitate may be limited by legislative enactment. Thus, in order to encourage invention or art, a patent or copyright may, for a limited period of time, protect one's interest in the physical appearance of his goods. The privilege is also qualified by the law of Torts to the extent necessary in order to prevent the sale of one's goods as those of another and to prevent the procurement of the means of imitation of unfair methods." Introductory Note to the subject of Confusion of Source, through Imitation of Appearance, Restatement of the Law of Torts, Volume 3, page 622.

■ The subject of imitation of goods and confusion of source is set forth at considerable length in the Restatement of the Law of Torts: "One who markets goods with an unprivileged imitation of the physical appearance of another's goods is liable to the other for the relief appropriate under the rules stated [hereafter], except to the extent that the other has by his own conduct disabled himself from claiming such relief." Section 711(c). "One who markets goods, the physical appearance of which is a copy or imitation of the physical appearance of the goods of which another is the initial distributor, markets them with an unprivileged imitation, under the rule stated in Section 711, if his goods are of the same class as those of the other and are sold in a market in which the other's interest is protected, and * * * (b) the copied or imitated feature has acquired generally in the market a special significance identifying the other's goods, and (i) the copy or imitation is likely to cause prospective purchasers to regard his goods as those of the other, and (ii) the copied or imitated feature is nonfunctional, or if it is functional, he does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the other."

Ibid, Section 741. In the comment on the foregoing clause in the Restatement, it is said: "An imitation is unprivileged under the conditions stated in the Clause for substantially the same reasons as those which make the imitation of trademarks or trade names unprivileged,[2] namely, the likelihood that prospective purchasers will be deceived and that diversion of trade will result from such deception. To subject the actor to liability under the rule stated in this Clause, *the imitated feature must be regarded by prospective purchasers as identifying the source of the product.* It is not sufficient that the feature is pleasing to them and that they desire goods having it. If that is the sole significance of the feature, competition would be unduly hampered by the prohibition of imitation. *It is only when the feature in fact identifies source and the imitation is likely to deceive prospective purchasers who care about source that the imitator is subject to liability.* \* \* \* If an imitated feature is functional but has also acquired generally in the market a special significance as an indication of the source of the goods, the imitation is privileged if it is accompanied by reasonable effort to avoid deceiving prospective purchasers as to the source. This may frequently be done by prominent disclosure of the true source. At other times, additional notice may be necessary. What steps are reasonable depends upon the circumstanc-

2. "A trade-mark is a trade-mark because it is indicative of the origin of the goods. The original right to its exclusive use was not based upon any statute, but upon principles of equity; and the right is acquired, not by discovery or invention or registration, but by adoption and use. The entire substantive law of trade-marks (excepting statutory provisions and construction) is a branch of the broader law of unfair competition. The ultimate offense always is that defendant has passed off his goods as and for those of the complainant." G. & C. Merriam Co. v. Saalfield, 6 Cir., 198 F. 369, 372. A "secondary meaning" of a word or phrase originally incapable of exclusive appropriation with reference to an article on the market—because geographically or otherwise descriptive—may nevertheless have been used so long and exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase has come to mean that the article was his product, or, in other words, as to that trade, has come to be his trade-mark. So that when a defendant approaches that part of the public with the bare word or phrase—and with nothing else—applied to his goods, he deceives that part of the public, and is required to accompany his use of the bare word with sufficient distinguishing marks normally to prevent the otherwise resulting fraud. For in this particular field, the word naturally indicates the product of the complainant, and hence defendant must do something to remove the natural impression. When a secondary meaning is once established, it is wrong to start with the premise that the defendant is entitled to use it, for, prima facie, he is not. The right in such a case is primarily vested in plaintiff. Defendant may not use the word at all, unless he accompanies it with the explanation; he must neutralize an otherwise false impression, and must unmistakably inform the public that the article is his product. The use of the trade-mark by the defendant raises the presumption that the sale of the product was effectuated by this false marking or unfair competition. But the reason upon which the rule is based is that, by the use of such a mark, the defendant is passing off his goods as those of complainant; "but, even in the case of a technical trade-mark, if every purchaser, immediate and ultimate, knew that he was getting the counterfeit, and not the genuine, and bought it because he preferred the counterfeit to the genuine, there would be no liability for profits." Ibid., at pages 372, 373, 375, 377.

"A registered trade-mark is infringed when sales by another under its mark are 'likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods', 15 U.S.C.A. § 1114; \* \* \* and the burden is on the plaintiff to show that such confusion is likely. The similarity must be 'such as would cause confusion of any appreciable number of ordinarily prudent purchasers as to the source of the goods,' Miles Shoes, Inc., v. R. H. Macy & Co., 2 Cir., 199 F. 2d 602, 603, which consumers buy without having the two products or their trade-marks before them for comparison." Peter Pan Foundations v. Beau-Bra Foundations, D.C.N.Y., 125 F.Supp. 637, 639.

es of each case. If they cannot be taken as a practical matter in a particular case, they are not reasonable in that case. If they are not calculated to avoid deception of customers, or if they would involve a financial expenditure which would substantially hinder competition in the sale of the goods, they are not reasonable. And if there are no reasonable steps to be taken in a particular case, the feature may be imitated despite its special significance.

"If the imitated feature is non-functional, then the imitation is unprivileged if, in fact, it is likely to deceive purchasers. Only steps which will effectively avoid this likelihood of deception can render the imitation of such a feature privileged." Restatement of the Law of Torts, supra, pages 627, 628. (Emphasis supplied.)

■ A feature of goods is functional, under the rule above stated, if it affects their purpose, action, or performance, or the facility or economy of processing, handling or using them; it is non-functional if it does not have any of such effects. Ibid., Section 742.

■ The leading cases in the federal courts sustain the principles above set forth in the Restatement of the Law.

"Unfair competition is not established by proof of similarity in form, dimensions, or general appearance alone. Where such similarity consists in constructions common to or characteristic of the articles in question, and especially where it appears to result from an effort to comply with the physical requirements essential to commercial success, and not to be designed to misrepresent the origin of such articles, the doctrine of unfair competition cannot be successfully invoked to abridge the freedom of trade competition." Marvel Co. v. Pearl, 2 Cir., 133 F. 160, 161. There is nothing unlawful in copying the unpatented products of another down to the last detail, except in so far as the resulting similarity may become a means of securing his customers through their belief, so induced, that your goods are his. Electric

Auto-Lite Co. v. P. & D. Mfg. Co., 2 Cir., 109 F.2d 566, 567. In Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279, 280, where a manufacturer of silks had copied the designs of the silks of plaintiff, who sought an injunction, Judge Learned Hand, speaking for the court, said: "In the absence of some recognized right at common law, or under the statutes * * * a man's property is limited to the chattels which embody his invention. Others may imitate these at their pleasure."

"There are a multitude of cases bearing on this branch of equity but the principles governing them are as simple as the fundamental rules of honesty and fair dealing. As was stated in Perlberg v. Smith, 70 N.J.Eq. 638, 62 A. 442, 444: 'What conduct on the part of a defendant will be held to constitute unfair competition is the subject-matter of discussion in cases too numerous for useful citation, but the principle applied in each case is extremely simple. As Lord Chancellor Halsbury said in the House of Lords, in the case of Reddaway v. Banham (1896) A.C. 199, p. 204 ([25] Eng. Rul.Cas. p. 197); "For myself I believe the principle of law may be very plainly stated; and that is that nobody has any right to represent his goods as the goods of somebody else." ' " Dad's Root Beer Co. v. Atkin, D.C.Pa., 90 F.Supp. 477, 485. Similarly, in Swank, Inc., v. Anson, Inc., D.C.R.I., 104 F.Supp. 703, plaintiff sought to enjoin defendant for unfair competition in copying the men's jewelry which it manufactured. The court held that although the jewelry was copied, it did not appear that defendant intended to cause its products to be passed off as the products of plaintiff; that the copying was of products in which plaintiff had no monopoly rights; that no trade-mark or patent was involved and defendant had marked its products so that the ordinary purchaser would not be deceived as to the source of the products under ordinary conditions, and that there was, therefore, no unfair competition. On appeal, 3 Cir., 196 F.2d 330, 332, it was held that "the fully established rule is that absent

a monopoly right, such as is conferred by ownership of a valid patent or trademark, one has the right to copy a competitor's product, even if by so doing he reaps an advantage from his competitor's advertising, provided he does not deceive the public by passing off his product as that of his competitor."

In Sinko v. Snow-Craggs Corp., 7 Cir., 105 F.2d 450, 453, defendant imitated plaintiff's product, a knob of distinctive marking and color combination, used as a handle for gear shift levers. In effect, defendant produced a facsimile of plaintiff's article. The court held that plaintiff was not entitled to an injunction for unfair competition, since defendant's action did not cause the public to believe that his goods came from plaintiff, and, in passing upon the issue, quoted Justice Holmes, when Chief Justice of the Supreme Court of Massachusetts, in Flagg Mfg. Co. v. Holway, 178 Mass. 83, 59 N.E. 667: " 'The defendant has the right to get the benefit of that (public) desire even if created by the plaintiff. The only thing it has not the right to steal is the good will attaching to the plaintiff's personality, the benefit of the public's desire to have goods made by the plaintiff.' " Sharing in the good will of an article unprotected by patent or trademark is the exercise of a right possessed by all persons, and is not unfair competition. Grosjean v. Panther-Panco Rubber Co., Inc., D.C.Mass., 26 F.Supp. 344, 352. In the foregoing case, defendant had imitated and sold heels and soles made out of a certain waste product which had been manufactured and sold by plaintiff. In holding that plaintiff had failed to prove unfair competition, the court said: "I cannot find that the plaintiffs have done more than to show possibly that people have come to associate the corporate plaintiff's product and the name by which it is sometimes known with the [plaintiff]. It is not shown that the primary significance of the term in the minds of the consuming public is not the product but the producer.' * * Assuming the admissibility of all the evidence proffered on this subject, * * * it all shows only isolated cases of confusion such as would naturally result where a new firm enters a field long exclusively occupied by another. By their nature, soles of this type must all look a good deal alike. *Such confusion as occurred was due not to any fraudulent marking or deceitful advertising by the defendant, but to the similarity of its products to those of the corporate plaintiff, which * * * were not protected by valid patents or infringed trade marks."* (Emphasis supplied.) Where a party brought an action for unfair competition because of the copying of certain printed forms originated by it, the court said: "These forms are not protected by copyright or patent. In the absence of such protection, plaintiff has no exclusive right to their use. They belong to the public and are open to use by defendants or any one else, and the enjoyment of that right by defendants carries with it only the obligation to identify their products in such manner that they will not reasonably be taken for those of plaintiff. Kellogg Co. v. National Biscuit Co. [305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73]. And it is not necessary that they so designate their merchandise that careless or indifferent buyers will not fail to know their source. Instead, they are required only to mark or designate them in such manner that purchasers exercising ordinary care to discover whose products they are buying will know the truth and not become confused or mistaken." Reynolds & Reynolds Co. v. Norick, 10 Cir., 114 F.2d 278, 281.

In a case in this circuit, American Fork & Hoe Co. v. Stampit Corp., 125 F.2d 472, 475, Judge Allen, speaking for the court, had occasion to discuss and pass upon various issues involving unfair competition and secondary meaning. In that case, plaintiff's and defendant's rakes were similar in form, color, and appearance; and plaintiff claimed that defendant had copied all the functional as well as the non-functional features of its product. However, no showing was made that defendant's rake was put out with any

intent to deceive, or was bought as originating with plaintiff; or that plaintiff's rake was bought because it was manufactured by it. The court held that plaintiff was not entitled to injunctive relief for unfair competition on grounds that its rake had acquired a "secondary meaning," and in passing upon the question of the proof required to sustain the claim of unfair competition, the court said: "No evidence of actual confusion was presented, but this is not necessary if confusion or deception is natural and probable as the result of the resemblance. However, the mere existence of possible confusion does not give rise to the right of injunction. * * * A secondary meaning attaches to a given shape or form of article *when that form is associated in the minds of prospective customers with the source from which the article came to such an extent that demand for the particular article depends upon the business reputation or standing of its maker.* * * * Moreover, in order to establish even the limited right of compelling appellant to take positive steps to avoid confusion, the existence of secondary meaning must plainly appear. * * * No peculiar mark or designation distinguishes appellee's rake, and nothing is presented showing that appellant's rake was put out with any intent to deceive. The fact of the low price adequately explains the increasing volume of appellee's sales, *but does not establish that the primary significance of the product is that it is manufactured by the appellee.* Therefore its case must fail. When it does not appear that the public has been moved in any degree to buy an article because of its source * * *, an action for unfair competition does not lie. As in the case of Sinko v. Snow-Craggs Corp., 7 Cir., 105 F.2d 450, all that is shown here is that the two rakes are similar in form, color and appearance; but there is no showing that appellant's rake was bought as originating with the appellee, nor that appellee's rake was bought because it was manufactured by it. This court, in Upjohn Co. v. William S. Merrell Chemical Co., 6 Cir., 269 F. 209, 212, * * * declared that 'certain it is that there is no recognized basis of any right to exclude others, save that extent and kind of public sanction which has induced a common identification of maker by product, and that only in this way can a plaintiff claim to have any property rights to be protected.'" (Emphasis supplied.)

A somewhat similar question was presented in James Heddon's Sons v. Millsite Steel & Wire Works, Inc., 6 Cir., 128 F.2d 6, 12, where a plaintiff claimed that the defendant made unnecessary imitations of the non-functional parts of its product, an artificial fish bait, and packaged them in such a way that the two articles appeared to the casual observer to be substantially identical in appearance, and retail purchasers would thus likely mistake one for the other. The court, after holding that the packages were dissimilar, said: "Appellee's bait design is so similar to appellant's that it would be frivolous to allow appellee to escape on the ground of dissimilarity. Appellant urges that by many sales and much advertising, the form of its article had acquired a secondary meaning * * *. There is no showing in the record that any person purchased appellee's bait because of its shape, size or dimensions believing it to be the product of appellant. * * * There is an entire absence of proof showing that appellee's bait of the design in question had been bought *because the purchaser believed it originated with appellant* rather than because they were useful articles with an attractive appearance. * * * It is to be remembered that appellee would have the right to slavishly copy the form, shape and size of appellant's bait, it being without trademark or patent protection, so long as it did not represent that the goods sold were those of appellant. Moreover the elements of the two baits are functional to such an extent that nothing short of a showing of clear likelihood of confusion would justify a court of equity granting appellant relief. * * * In this connec-

tion it is well to point out that a feature of goods is functional if it affects their purpose, action or performance or the facility or economy of processing, handling or using them, or if the shape, size or form of the article contributes to their utility, durability or effectiveness or the ease with which they serve their function." (Emphasis supplied.)

In Gum, Inc., v. Gumakers of America, Inc., 3 Cir., 136 F.2d 957, it was held that one may manufacture and sell a product indistinguishable in appearance from an original competing product unless the original has become associated in the public mind with its producer, provided one identifies his own product and does not infringe a patent, trade-mark, or copyright. The case involved the sale and packaging of bubble gum in cylindrical shape and it appeared that defendant had developed a gum resembling plaintiff's; that it packaged it in the cylindrical shape and appearance used by plaintiff for ten years before defendant entered the field; that plaintiff had expended large sums in advertising the gum; that officers and employees of the defendant had at one time been associated with the plaintiff, and, after severing their association, proceeded to market a bubble gum which in the course of time, developed a remarkable resemblance to plaintiff's products; that, thereafter, defendant's sales of its bubble gum increased considerably in volume; that retailers of bubble gum frequently sold one for the other; and that members of the public were at times confused as to the origin of one or the other gum. The court observed that it would be possible to conclude that plaintiff, by its pioneer work in the field, created the desire in the public for bubble gum having the appearance of its product, and that defendant copied that appearance and profited by the public demand which the plaintiff had aroused. However, the court held that this evidence would not justify a finding that the public associates, with the plaintiff, bubble gum having the appearance of its product in the form in which it was marketed,

or that the public demand was for plaintiff's product as such. Moreover, the court declared that the labels showed that the gum was made by different companies, and that all the plaintiff had the right to insist upon was that the defendant use reasonable care to inform the public of the source of its product, under the authority of Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73.

Mere similarity in appearance of plaintiff's electric clock to the handsome external appearance of defendant's higher-priced foreign produced clock unique in the horological world in that it was atmospherically operated, was held not to constitute unfair competition, especially since plaintiff's clock was plainly marked as its product. Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc., D.C. N.Y., 119 F.Supp. 209, 212. In the foregoing case, the court observed: "There was no evidence to show that the public cared what was the ultimate source of the clock."

In Newburgh Moire Co., Inc., v. Superior Moire Co., Inc., D.C.N.J., 116 F. Supp. 759, 764, where it was shown that defendant had used moire designs so similar to plaintiff's that even defendant's own expert and defendant's attorney confused the products produced by plaintiff and defendant, it was held that such copying alone was not, in law, unfair competition. The court observed: "In addition to striking similarity in design, plaintiff showed that defendant had copied in some cases identical names for the patterns, and in other cases confusingly similar names. Although the court may dislike such practice, it may not enjoin it or penalize defendant for it. The essence of unfair competition is the practice of palming off one's product as that of another. No assertion, let alone proof, was made that defendant had gone that far."

Where a plaintiff had been selling a game under the name of "Parcheesi" and sought an injunction against defendant who was competing with a game called

"Pachisi," the court held that there was no evidence to prove any palming off of defendant's product. In concluding that the word, "Parcheesi," had not acquired a secondary meaning, the court said that the public knew it as a game and not as an article made by plaintiff, and that not one purchaser in a thousand would know or care who was the manufacturer. Selchow & Righter Co. v. Western Printing & Lithographing Co., 7 Cir., 142 F.2d 707.

A new competitor is not held to the obligations of an insurer against all possible confusion. He is not obligated to protect the negligent and inattentive purchaser from confusion resulting from indifference and is not required to make the market "foolproof." He is only required to mark or designate his product in such manner that purchasers exercising ordinary care to discover whose products they are buying will know the truth and not become confused or mistaken. Life Savers Corp. v. Curtiss Candy Co., 7 Cir., 182 F.2d 4, 8. To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, "That is the article I want because I know its source," and not the negative inquiry as to "Who makes that article?" In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it. Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 7 Cir., 133 F.2d 266, 270.

From the above authorities are to be drawn the following guides for adjudication of this case: Upon the expiration of appellee's patent, there became dedicated to the public the patented article in the identical form in which it had theretofore been produced and marketed by appellee; that appellant, on such expiration, was entitled to copy exactly appellant's clamp in all particulars; that in manufacturing and selling such article, appellant was only obliged to avoid confusing and misleading the public into believing that its clamps were those of appellee; that the only confusion that appellant was obliged to avoid was confusion as to the source of the article sold —or, in other words, confusion as to who the producer was; that, in avoiding such confusion in making and selling the article, appellant was only required to mark his product in such manner that purchasers, interested in who the producer was, and exercising ordinary care to discover what products they were buying, would not be confused as to the source of the products.

The essence of unfair competition is the practice of palming off one's product as that of another. There is no allegation in the bill of complaint that appellant was guilty of such conduct; and there was no proof to sustain such a charge, if it had been made. Moreover, in its findings and orders in this case, the district court did not find or hold that appellant had been guilty of misrepresenting the source of its products or palming them off as those of appellee.

Appellant copied appellee's product as it had a right to do. It impressed upon that product its own trade-mark in place of the trade-mark that appeared on appellee's product. Anyone looking at the clamps could easily see which bore appellant's trade-mark, and which bore appellee's trade-mark. In fact, the president of appellee company, under examination by his counsel, testified why he thought that there was "opportunity for confusion" as a result of the production and distribution of a clamp identical to appellee's clamp, which bore appellant's trade-mark. The reason he gave was that appellee's distributors had inquired of appellee whether appellant, because of its trade-mark affixed to the clamps it manufactured, was distributing the clamps made by appellee. Because appellant's trade-mark on its clamp prompted such a question does not indicate that appellant had not sufficiently differentiated its clamp from appellee's clamp. The fact that such questions were asked shows that doubt was thrown into the minds of appellee's own agents as to the origin of the clamp because of appellant's trade-

mark affixed thereto. It was not necessary for appellant to affix further information to its clamp, beyond its trade-mark, in order to avoid confusing the public as to the producer or source of the product. How a purchaser exercising reasonable care could be deceived into buying a clamp plainly marked with the name and trade-mark of appellant in the belief that it was buying appellee's clamp is beyond comprehension. The advertisements in which appellant used a picture of a clamp reproduced from photographing one of appellee's clamps, clearly disclosed, in large and prominently displayed lettering, that appellant was the manufacturer; and there also appeared on the clamp, so reproduced, appellant's trade-mark. There could be no confusion of source, or of producer, from appellant's advertisements. Any purchaser exercising ordinary care could not have been confused as to the manufacturer of appellant's clamps; and there is no evidence that the public or any purchaser was interested as to who was the manufacturer of the clamps.

In an earlier case in this circuit, Globe-Wernicke Co. v. Fred Macey Co., 119 F. 696, where defendant had copied plaintiff's sectional bookcases, not only imitating the system by which they fitted into the original structures, but also the sizes, styles, material, and finish of the plaintiff, the court said that, while a party might adopt distinguishing marks to denote the origin of production as being his own, or adopt some other peculiar method of distinguishing his own goods, and thus retain the benefit of the good reputation which he had acquired for them, he could not distinguish his goods by such universal characteristics as the kind of material from which they are made or the style or finish of the work unless it is peculiar and out of the ordinary; and the fact that, because of the resemblance of defendant's articles to plaintiff's, the public is led to buy defendant's articles, does not give plaintiff the right to an injunction. Thus, the fact that the features of the clamps copied by appellant were well designed, attractive,

and convenient for use, does not result in unfair competition, unless the public is deceived into believing that the clamp copied and manufactured by appellant was made by appellee. For, as Judge Learned Hand said in Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299, 300, "it is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person—the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure. It will not be enough only to show how pleasing they are, because all the features of beauty or utility which commend them to the public are by hypothesis already in the public domain. The defendant has as much right to copy the 'nonfunctional' features of the articles as any others, so long as they have not become associated with the plaintiff as manufacturer or source. The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward; no degree of imitation of details is actionable in its absence." It is only when the imitation is likely to deceive prospective customers who care about source that the imitator is guilty of unfair competition.

From an examination of the clamps made by appellant and of those made by appellee showing the different trade-marks affixed thereto, and upon an inspection of appellant's advertisements of its clamps clearly disclosing that it was the manufacturer of such clamps, it is clear that no purchaser exercising ordinary care could have been confused as to the source or producer of appellant's clamps.

█ Since the trade-marks and advertisements clearly disclosed that appellant was the maker of its clamps, no issue of "secondary meaning" arises in this case so that the question whether

appellant copied the nonfunctional features of appellee's clamp is here irrelevant. For copying nonfunctional features, under such circumstances, could not lead the purchaser using ordinary care to believe that the clamps were made by appellee. The doctrine of "nonfunctional" features only applies where the imitation of such features imputes to the copy the same authorship as the original. Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279, 280.[3] As already said, there was no evidence that any purchaser was interested in who made the clamp. It was a type of clamp well known in the industry, and from all that appears, purchasers were interested only in the type of the clamp and not the maker—in the product and not the producer.

Appellee cites Wesson v. Galef, D.C. N.Y., 286 F. 621, as sustaining its contention that the exact copying of the features of appellee's clamp resulted in unfair competition. That case is distinguishable. There, the ensemble of plaintiff's revolver, a Smith & Wesson, had come to mean the product of the manufacture of plaintiff, an old and well-known firm. In fact, few products in the past have been better known than the Smith & Wesson, along with the Colt revolver. The mere mention of their names in former times has inflamed the imagination of youths dreaming of deeds of derring-do; and these guns have been known to generations of soldiers, sportsmen, and police officers, as well as to their quarry. The Smith & Wesson revolver had many peculiar features which had made it known to the public as the product of the manufacturer of those guns. The barrel, for instance, was squared at the frame end, which was unnecessary. This was copied, as well as its peculiar profile. A stop on the left to hold the chamber when it was swung out of position was exactly imitated in shape. Other well-known characteristics of the gun were also copied. In view of these circumstances, the court found that the purpose of the imitation was to sell the copy as a Smith & Wesson revolver. In the instant case, there is no evidence to support any such findings.

What has been said disposes of appellee's chief contention which is addressed to the proposition that where a manufacturer engages in the unnecessary

---

**3.** Although the issues of nonfunctional features and "secondary meaning" are not properly issues in this case, it may be observed that, as appellee's president testified: "All parts [of the clamp] serve as a basic component, or otherwise they would not be there. * * * Everything that is on the clamp is functional to an 'extent.'" Moreover, the handle of the clamp which appellant copied, and which appellee insisted was unnecessarily imitated, was the same handle that is disclosed in the drawings of the expired patent, and even if the issue of "secondary meaning" were properly before us, appellee would not be entitled to prevent appellant from copying that feature. "By the force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly. Hence we have held that the patentee may not exclude the public from participating in that good will or secure, to any extent, a continuation of his monopoly by resorting to the trademark law and registering as a trademark any particular descriptive matter appearing in the specifications, drawings or claims of the expired patent, whether or not such matter describes essential elements of the invention or claims." Scott Paper Co. v. Marcalus Mfg. Co., Inc., 326 U.S. 249, 256, 66 S.Ct. 101, 104, 90 L.Ed. 47.

Moreover, the range of functionality, under varying circumstances, includes shape, size, and color. See Vaughan Novelty Mfg. Co. v. G. G. Greene Mfg. Corp., 3 Cir., 202 F.2d 172, 175. A feature of goods is functional if it affects their purpose, action, or performance, or the facility or economy of processing, handling, or using them; it is nonfunctional if it does not have any of such effects. But the term "functional," is not to be treated as synonymous with the literal signification of the term "utilitarian." A design, for example, may not be utilitarian in a technical sense, but it may nevertheless be functional in the sense that it will contribute materially to a general sale of the goods. J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 120 F.2d 949.

imitation of the nonfunctional parts of the product of a competitor to the extent that the two articles are substantially identical in appearance, and retail purchasers are thus likely to mistake one for another, he is chargeable with unfair competition, citing Enterprise Mfg. Co. v. Landers, Frary & Clark, 2 Cir., 131 F. 240; Yale & Towne Mfg. Co. v. Alder, 2 Cir., 154 F. 37; and Rushmore v. Manhattan Screw & Stamping Works, 2 Cir., 163 F. 939, 19 L.R.A.,N.S., 269. While,

in the instant case, the fact that purchasers using ordinary care would not have been mistaken as to the source of appellant's product, and the evidence that everything about appellee's clamp was functional to an extent, removes from the case the issue of imitation of nonfunctional features and "secondary meaning," it may, nevertheless, be observed that the three cases above cited eventuated in a position which is contrary to the great weight of authority.[4]

4. In Enterprise Mfg. Co. v. Landers, Frary & Clark, supra [131 F. 241], defendants copied the coffee mills manufactured by complainant in size and general shape, as well as all minor details of structure— "every line and curve being reproduced, and superfluous metal put into the driving wheels to produce a strikingly characteristic effect—while the goods are so dressed with combinations of color, with decorations reproduced or closely simulated, with style of lettering and details of ornamentation, that, except for the fact that on the one mill is found the complainant's name, and on the other the defendants', it would be very difficult to tell them apart." In deciding the case, the court said: "It is elementary law that, when the simulation of well-known and distinctive features is so close the court will assume that defendants intended the result they have accomplished, and will find an intent to appropriate the trade of their competitor, even though in their instructions to their own selling agents they may caution against oral misrepresentations as to the manufacture of the goods. There is evidence to show that purchasers have been deceived as to the identity of these mills, but, in the case of a Chinese copy, such as defendants offer to the public, such proof is hardly needed. * * *

"No doubt, with such identity in attractiveness, competition with complainant's mills would be much more effective; but defendants overlooked the fact that a court of equity will not allow a man to palm off his goods as those of another, whether his misrepresentations are made by word of mouth, or, more subtly, by simulating the collocation of details of appearance by which the consuming public has come to recognize the product of his competitor." The fact that the mills were marked with complainant's and defendants' names seemed of little import to the court.

In Yale & Towne Mfg. Co. v. Alder, supra [154 F. 38], the unfair competition was based upon defendant's simulation of

plaintiff's padlock in form, size, coloring, lettering, and details of finish, and copying it so closely in these details that his articles were likely to induce purchasers to buy his padlocks supposing them to be the padlocks of the plaintiff. The court held that when the defendant appropriated all of the prominent features of plaintiff's articles, so assembled them that they would produce the same general effect, and in such a way that the ordinary purchaser would not be apt to discover the difference, enough appeared to establish unfair competition. The court observed that the defendant had gone too far when he produced a padlock which to casual observation was substantially identical in appearance with the plaintiff's, and declared that the defendant's "apparent purpose was to extend his trade with retail dealers and supplant the plaintiff's sales to such dealers by furnishing them with an article which could be sold readily to customers as the article made by the plaintiff. When the defendant sold his locks to the retail dealers at a considerably less price per dozen than that which they were obliged to pay for the plaintiff's locks, he placed a strong temptation before these dealers to buy his locks and increase their profits by selling them to customers wanting to purchase the plaintiff's higher-priced locks; and we are constrained to believe it was intentionally and deliberately done in order to increase his trade at the expense of the plaintiff's." The court indicated its feeling as to those who copied the ideas and products of others by its observation that the evidence showed a "laxity of business morality among lock manufacturers in appropriating the form, dress, and general appearance of each other's products which is not commendable, and which it is to be hoped does not exist in other trades."

In Rushmore v. Manhattan Screw & Stamping Works, supra [163 F. 942], it was held that one who manufactured and sold a well-known article of commerce, in this case, an automobile search-light en-

From the foregoing, it is our conclusion that appellant was not guilty of unfair competition, and, accordingly, the judgment appealed from is reversed, the injunction is set aside, and the case is remanded to the district court with instructions to dismiss the complaint.

closed in a shell of graceful but unpatented design, may maintain a bill for an injunction, profits, and damages, against a defendant who sells an automobile searchlight enclosed in a similar shell, although his name appears prominently thereon as the maker, and he has never represented that his lamps were made by complainant, if it is shown that the similarity of the shells does or is likely to deceive purchasers. The court based its decision upon the authority of Enterprise Mfg. Co. v. Landers, Frary & Clark, supra, and Yale & Towne Mfg. Co. v. Alder, supra, but it nevertheless declared that its decision "carries the doctrine of unfair competition to its utmost limit. If it be pushed much farther those engaged in trade will be encouraged to run to the courts with trivial complaints over the petty details of business and thus will grow up a judicial paternalism which in time may become intolerable." In a dissenting opinion, Judge Noyes pointed out that the complainant had no design patent and "his case must stand, if at all, as a case of unfair trading, in which the essential element is deception—the palming off of one's goods as those of another. But how a purchaser could be deceived into buying an automobile lamp plainly marked with the name and trade-mark of the defendant in the belief that it was the complainant's lamp is more than I can comprehend. The mere similarity in the shape of the lamps in my opinion is not sufficient to produce such a result. The majority, however, in view of earlier decisions of the court, are of the opinion that the similarity in itself establishes a case of unfair competition."

The foregoing cases seem to emphasize what the court felt was the unfairness of defendants' appropriation of plaintiffs' ideas and features of construction, and the identical copying of them; and this consideration seems to lie at the basis of decision in those cases, rather than any proof that the defendants palmed off their products as those of plaintiffs, or caused the public to believe that their articles came from plaintiffs, which is the criterion now generally adopted. While such an appropriation of another's ideas and novel devices is not, in law, unfair competition, such conduct often appears to be and is piratical; but in protecting freedom of competition, the legislative branch of the government has not found a way to safeguard the originator of novel ideas and devices except within the framework of the patent and copyright laws. In a case involving such a problem, Judge Learned Hand, in Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279, 281, observed that "it would seem as though the plaintiff had suffered a grievance for which there should be a remedy, perhaps by an amendment of the Copyright Law, assuming that this does not already cover the case, which is not urged here. It seems a lame answer in such a case to turn the injured party out of court, but there are larger issues at stake than his redress. Judges have only a limited power to amend the law; when the subject has been confided to a Legislature, they must stand aside, even though there be an hiatus in completed justice. An omission in such cases must be taken to have been as deliberate as though it were express, certainly after long-standing action on the subject-matter." See also the discerning and informative article, "Preventing Design Piracy: A Copyright Law for Industrial Designs," by Stewart L. Whitman, American Bar Association Journal, March 1955, page 242.