SYLVANIA ELECTRIC PRODUCTS,
Inc., Plaintiff,

v.

DURA ELECTRIC LAMP COMPANY,
Inc., and Michael Portnow,
Defendants.

Civ. A. No. 385–54.

United States District Court
D. New Jersey.

Aug. 29, 1956.

---

7. Defendant cites also Symonides v. Crenshaw (E.D.Va.), decided October 27, 1953 (1953 C.C.H., par. 9639).

Pitney, Hardin & Ward, Newark, N. J., for plaintiff, by Arthur J. Martin, Jr., Newark, N. J., Watson, Leavenworth, Kelton & Taggart, New York City, of counsel for plaintiff, by Leslie D. Taggart, Robert C. Nicander, Nicholas John Stathis, Howard M. Cohen, New York City.

Harry B. Rook, Newark, N. J., for defendants, Mock & Blum, New York City, co-counsel for defendants, by Alexander Friedman, Edward F. Levy, New York City.

WORTENDYKE, District Judge.

■ This action is brought under the Lanham Act, 15 U.S.C.A. § 1051 et seq., for alleged infringement of a claimed trade-mark, admittedly registered in the United States Patent Office on October 30, 1951 with number 550,211, which presently remains uncancelled, and is owned by plaintiff, and for injunctive relief against alleged unfair competition. This Court has jurisdiction under § 1114 of the Act, 15 U.S.C.A. § 1114, also by 28 U.S.C.A. § 1338, and also because there is diversity of citizenship between plaintiff and the defendants, and the complaint alleges involvement of more than the minimum jurisdictional amount, 28 U.S.C.A. § 1332(a) (1). Cf. Standard Brands Inc., v. Smidler, 2 Cir., 1945, 151 F.2d 34, 36. The individual defendant, Portnow, admittedly president and managing officer and owner of fifty per cent of the stock of the corporate defendant, Dura Electric Lamp Company, Inc. (hereinafter called Dura) is charged by plaintiff with bringing about and continuing the alleged infringement and unfair competition by Dura through his control of that corporation. Plaintiff prays relief in the form of injunction, accounting, treble damages, delivery up for destruction of the allegedly offending products, and costs. The Court has jurisdiction of the parties.

Both plaintiff, Sylvania Electric Products, Inc. (hereinafter called Sylvania) and defendant, Dura, manufacture and sell, in interstate commerce, electric flash-bulbs used in flash-light photography. While generally sold in paper cartons and sleeves upon which the name and admitted trade-mark of the manufacturer appears, these bulbs are also sold in substantial quantities unpackaged and in bulk. No name of the manufacturer appears upon any individual bulb produced by either of the corporate parties; but there is placed during the course of manufacture at the top of the inside of the glass globe, opposite the base of every bulb produced by each of said parties, a dot or spot, generally circular in form, about one-eighth inch in diameter composed of cobalto-cobalti cyanide salt. During application, this salt is pink in color and is in suspension in a suitable liquid vehicle which is evaporated when the interior of the bulb is exhausted of atmospheric air upon the final sealing of the globe to the stem of the lamp. If the exhaustion of the moisture-bearing atmosphere from the globe has been adequate, the color of the spot or dot changes to blue. If, however, the color does not so change, but remains or returns to pink, insufficient exhaustion from or subsequent intrusion, through leakage, of atmosphere into the bulb is thereby indicated. The presence of this complex chemical within the globe of the bulb serves as a means of indicating to the manufacturer as well as to the distributor and ultimate user whether or not the bulb is defective. Both Sylvania and Dura recognize this utilitarian function of the dot or spot in their advertising and sales promotion; but Sylvania asserts that through the long and uninterrupted use by it and its predecessors of this spot or dot, with the color, of the composition, in the form and at the location in the bulb above described, commencing long anterior to the beginning of its use by Dura, the spot or dot had acquired a secondary meaning as a mark of identification of the bulb in which it appeared as the product of Sylvania or of one of its said predecessors. Sylvania charges, therefore, that defendants' use of a spot or dot, similar in shape, position, location and color, upon the bulbs which Dura manufactures, without an indication *on the bulbs themselves* that they are not products of Sylvania, is likely to enable Dura to "palm off" its products upon consumers by misleading the latter into the belief that bulbs manufactured by Dura were actually the products of Sylvania.

Defendants, while admitting that Dura uses a blue dot of cobalto-cobalti cyanide in each of the bulbs which it manufactures of a size and shape and at a position similar to that occupied by the blue dot in Sylvania's bulbs, assert that the dot serves the purely utilitarian function

hereinabove described.[1] Defendants also charge that the use of the blue dot was covered by claim number 12 of United States Patent number 1,989,572, issued January 29, 1935, which has expired, and that such use of a spot of cobalt salt in a photoflash bulb is therefore in the public domain, available to all. Defendants therefore deny that the blue dot is a trade-mark and charge that plaintiff was not entitled to have it registered as such. Indeed, on July 11, 1952 Dura filed a petition in the United States Patent Office, pursuant to 15 U.S.C.A. § 1064, for the cancellation of plaintiff's registration, claiming invalidity thereof. These cancellation proceedings were suspended upon Sylvania's motion therein, pending final adjudication of the issues in the instant suit. Defendants deny that the blue dot serves to identify and distinguish plaintiff's flash-bulbs, and they also deny that the use of the blue dot by Dura constitutes unfair competition.

Insofar as it relates to the history of the use of the so-called blue dot or safety spot in photoflash bulbs, the evidence in this case discloses as follows: In or prior to the year 1931, N. V. Philips Gloeilampenfabrieken, a Dutch corporation (hereinafter referred to as Philips), in Eindhoven, Netherlands, developed an electrically ignitable photoflash bulb, using hydronalium wire instead of foil as the flashing agent. In the course of this development, Philips originated the use within the globe of the bulb and at its top end, opposite the base, of a dot or spot composed of cobalt salt as a means of detection in the course of manufacture of "leakage", through cracks or flaws in the globe or base of external atmosphere into the gas-charged interior of the bulb. For this invention British patent number 436,047 (Exhibit D–134) was issued to Philips following acceptance of its specifications on October 3, 1935. When such atmospheric intrusion occurred in one of these bulbs, the color of the cobalt spot (which had been pink when applied in suspension in liquid, but would become blue when dehydrated by evacuation of air and dried by heat) would turn back to pink; thus indicating the presence of moisture-laden gas within the bulb resulting from defective manufacture or subsequent damage.

---

1. Dura has, from the outset of its manufacture of photo-flash bulbs, adopted and employed as its trade-mark the name "Dura Flash", which is conspicuously placed on the racks and sleeves in which its bulbs are generally packaged, sold and shipped, and which was registered in the United States Patent Office on October 30, 1951 as No. 550,192 (Exhibit D–136). Dura has never held out the blue dot (which admittedly appears on each of its bulbs) as a trade-mark. Its packages have always been the same in color, composition and arrangement since it commenced the manufacture of its bulbs. Its bulbs have borne the blue dot at the same location in each since Dura commenced production of them under license from the holder of the patent (U.S. No. 1,989,572).

Sylvania is also the owner of Registration No. 343,849 in the United States Patent Office dated March 9, 1937 (Exhibit P–88) for the trade-mark "Super Flash", which appears on all cartons and sleeves in which its (blue dot) bulbs are packaged. This registration was applied for by Sylvania's predecessor, Wabash Appliance Corp. (hereinafter called Wabash) in whose name the certificate issued. In the "Statement" set forth in the certificate, appears the following:

"The trade-mark is applied or affixed to the goods by stamping or attaching a printed label or paster, containing said trade-mark, on packages containing the goods, and on boxes or cartons in which said lamps or bulbs are placed.

"Applicant disclaims the exclusive right to the use of the words 'Signal Spot', 'Flash' and 'Photolamp' and representation of the lamp or bulb separate and apart from the mark as shown in the drawing."

The drawing referred to is a plane view of a photoflash bulb showing a circular spot or dot at the center of the end of the globe opposite the base, with an arrow bearing the words "signal spot" pointing to the dot, the words "Super Flash" diagonally across and the word "Photolamp" immediately below the drawing. The Statement also sets forth that the trade-mark has been continuously used in applicant's business since January 2, 1936.

Salts of cobalt had been well known, long prior to Philips' use of the substance as a leakage indicator, to have the characteristic of exhibiting a pink color when diluted and a blue color when dried or in concentrated solution. See 2 Thorpe's Dictionary of Applied Chemistry (Rev. ed. 1921) page 299. The British Patent covered the bulb which it had developed, and included in the specifications thereof was the use of cobalto-cobalti cyanide as an indicating material. A United States Patent No. 1,989,572, Exhibit D–135, was issued to Philips (as assignee of Van Liempt, et al.) on January 29, 1935. This patent was also referred to in the testimony as the "Van Liempt" patent. This Court concludes that it covered the use of the "blue spot" composed of the materials and located at the position employed in the Sylvania and in the Dura bulbs, but expiration of the patent on January 29, 1952 threw the right to use such "spot" into the public domain.

By the terms of a written agreement (Exhibit P–87) Philips granted to Wabash, a New York corporation with place of business in Brooklyn, New York, an exclusive license (subject to a non-exclusive license retained by the licensor for itself or for an affiliated company) to manufacture, use and sell, throughout the United States "photoflash lamps of the type in which the material which emits actinic light when it is chemically reacting, is provided in the form of a thin wire." The agreement also provided that its scope comprised all United States patents and patent applications listed in an attached exhibit "insofar as the same may be used for or be applicable to the devices" (the photoflash lamps of the type above described) "falling under this agreement, and includes the technical information and manufacturing experience for the manufacture of these devices." The licensee (Wabash) agreed to pay to the licensor royalties on all devices sold by licensee under the agreement at the rate therein prescribed. The list of patents and applications attached to the foregoing agreement (Exhibit A therein referred to) is as follows:

U. S. A. Patent No. 2,037,101 of April 14, 1936

U. S. A. Patent Application Ser. No. 723,010, filed April 28, 1934

U. S. A. Patent Application Ser. No. 18,457, filed April 26, 1935

U. S. A. Patent No. 1,989,572 of January 29, 1935.

The production of photoflash bulbs by Wabash under this agreement met with favorable consumer response and the demand for its product ultimately threatened to outrun its ability to produce.

As early as October 1, 1940, Wabash issued to its dealers for distribution to consumers with its lamps an exposure data card (Exhibit P–90) containing "Flash and Flood Exposure Tables," a price list of its different sized bulbs, and a picture of one of its bulbs prominently displaying the spot on the end of the globe opposite the base and a legend, pointed to the spot, which read:

"This Wabash Safety Spot means 3 important things
1. a Safe flash bulb!
2. a Dependable flash bulb!
3. a Wabash Superflash bulb!"

Abe M. Parker, then President of Wabash, on his pretrial deposition (Exhibit P–62) testified that the foregoing legend was placed upon the exposure data card to explain "just exactly what this bulb did" and that the bulb was made by Wabash—that "the blue spot always identified that it was a Wabash Superflash bulb." General Electric and Westinghouse were competitors of Wabash in the photoflash bulb business at the time (1940); but the product of neither of these competitors bore any blue dot upon it. Similar advertising content, in a variety of other media, was employed by Wabash until it sold as of January 1946 its factory, equipment, goods in process, know-how and patents (all of its business except cash and accounts receivable) to plaintiff Sylvania. Since its acquisition of this business from Wabash, plaintiff has vigorously and at progressively increasing expense

pursued an advertising campaign in press, periodicals, a television program[2] and by other means featuring the "Blue Dot" as a functional and identifying characteristic and feature of the photoflash lamps which it manufactures. Plaintiff's annual advertising expenditure rose from $34,456 in 1946 to $1,266,000 in 1955.

Both sides to the controversy presently before the Court recognize, and the Court finds that, because of its chameleon-like characteristic of manifesting a color change under the influence of the presence or absence of moisture-bearing atmosphere, cobalt salts were originally, and have been employed by both corporate parties in the manufacture of photoflash bulbs for the utilitarian purpose of indicating to the manufacturer that his evacuation of the bulb is inadequate and to the consumer that the bulb contains air and is not operative or safe to use. Plaintiff, however, with apparent full recognition of the afore-said utilitarian function of the "blue spot", nevertheless contends that because it was placed by plaintiff and its predecessors in the form, with the color, and at the location employed by them ("a circular blue dot about one-eighth inch in diameter located at the top end of the bulb opposite its screw base"—as described in plaintiff's Registration No. 550,211 dated October 30, 1951, Exhibit P-1)—the dot or spot has acquired by common public acceptation the status of a symbol indicating that the product bearing it is that of the plaintiff, and that consumers generally so assume in selecting and purchasing the product. In support of this contention, plaintiff presented the testimony, both on the trial and on pretrial depositions, of many witnesses (over 60 in number), mostly amateur photographers residing respectively in various municipalities in the States of New Jersey and New York and pursuing a variety of vocations. Each witness had been previously interviewed by an investigator employed by plaintiff.[2a]

2. In the "audio" column of the television script (Exhibit D-67) for plaintiff's "Beat the Clock" program for December 8, 1950 the "Opening Commercial" read (insofar as it referred to the "blue dot") as follows:

"To give your pictures that clear, clean, professional look use Sylvania Superflash Flashbulbs, with the exclusive Blue Dot identifying feature. Superflash will give instant sharp illumination. They'll light your subject evenly without harsh shadows. Superflash bulbs you know, contain oxygen to give brighter light. If the oxygen escapes, the Blue Dot will turn pink. So when the dot is blue you are *sure* it's ready to work for you. Superflash bulbs also have a double radioactive coating and a specially engineered filament that permit firing even when batteries are weak. Yet with these and many other advantages Superflash bulbs cost no more than ordinary flashbulbs."

In the *script for the program of De-cember 15, 1951* (Exhibit D-71) we find:

"And for the best pictures, use Sylvania Superflash bulbs, the sure-firing flashbulbs that are the choice of famous press photographers. Superflash are made in the round, light bulb shape to give even, sharp illumination, and are primed with oxygen and quick flashing aluminum for instant, brighter light. Every Superflash bulb has this identifying Blue Dot. And if a bulb is damaged in shipment, the Dot turns pink and your dealer will replace the unused bulb free. Superflash come in all sizes for black and white or color photography."

2a. The persons interviewed were selected from two lists of participants in a contest run by the plaintiff as part of its television advertising program during the years 1953 and 1954. One of these lists comprised the contest winners and the other the contest losers. The residences of the persons whose names appeared on these lists were within the New York metropolitan area. The typical approach of plaintiff's interviewer to each of the consumer witnesses is reflected in the description given by the witness Edna Stevens, of Bronxville, New York, in her pretrial deposition as a consumer witness for plaintiff:

"Q. Did a young lady visit you about six months ago and show you a flash-bulb? A. Yes, she did.

"Q. Will you tell us what she said and what you said? A. She asked me did I recognize a flashbulb she showed me, with a blue dot on it, and I said, yes, I did, that it was a Sylvania bulb.

"Q. And how did you know that it

Each interview conformed generally to a similar pattern, viz., the investigator, after identifying herself or himself, exhibited to the witness a photoflash bulb bearing at the top of the glass globe, opposite the base, a blue dot. The witness was then asked to identify the maker of the bulb and in each instance stated that it was the product of plaintiff because it bore a blue dot at the location exhibited. Substantially all of these witnesses had become familiar with plaintiff's advertising of the blue dot feature of its flash bulbs through television programs and other media. Most of them were in the habit of buying their flash bulbs in a carton or sleeve, which admittedly bore, prominently displayed thereon, printed reference to the blue dot and its functions, in conjunction with the name of the plaintiff as manufacturer thereof. Many specimens of such cartons, sleeves and racks or platforms in which the bulbs are inserted, admitted in evidence, emphasize both the utilitarian function of the blue dot and the fact of its use in the bulbs manufactured by plaintiff.[3]

The parties admit that plaintiff and its predecessor have since 1936 continuously manufactured and sold photoflash bulbs with the blue dot marking with which this litigation is concerned, positioned on the bulb at the end opposite the base. It is likewise admitted that since April 1950 defendant Dura has manufactured and sold photoflash bulbs with a similar blue dot marking positioned identically as on the bulbs of the plaintiff. The Court finds no evidence that the spot of cobalto-cobalti cyanide which Philips originally used as a "leakage detector" in its bulbs was ever adopted or recognized by Philips as a trademark, or that Philips ever secured a registration thereof as such. Wabash (Philips' licensee), which commenced manufacturing photoflash bulbs under its license agreement in 1936, did not secure a registration incorporating the blue dot as part of its trade-mark "Super

---

was a Sylvania bulb? A. Because of the blue dot."

The witness was then shown a flashbulb, initialed by her, which she identified as the bulb which had been exhibited to her by the investigator. On cross-examination the witness (Stevens) testified:

"Q. How many flashbulbs were you shown at that time? A. Just the one, I think. ·

"Q. Did this lady tell you whose bulb it was after she asked you about it? A. I don't think she told me the name of the company that manufactured them, no.

"Q. Well, did she tell you it was manufactured by another company than Sylvania? A. Yes."

Reports of the investigators who interviewed some of these customer witnesses (Exhibits D–8, D–11 and D–13) indicate a general uniformity in manner of approach, e. g. Investigator: Who makes this bulb? Subject: Sylvania. Investigator: How do you know? Subject: By the blue dot. Investigator: Do you know of any other firm which uses blue dots on its bulbs? Subject: No. Investigator: This is not a Sylvania but a Dura bulb. The blue dot confused you, didn't it? Subject: Yes. Investigator: Will you be willing to testify? (etc.)

3. The yellow and black cartons in which plaintiff's flashbulbs were early distributed bore the printed sentence: "The Only Flashbulbs With The Blue Safety Spot." Later editions of these cartons were without this legend. Upon the platforms holding the bulbs which slide within the sleeves originally appeared the printed directions: "Always Look For The Blue Spot! It Is Your Protection Against Damaged Bulbs. Do Not Use Bulbs If The Spot Is Pink. Keep Bulb In Sleeve Until Ready To Fire." More recently the platforms used by plaintiff have been without any printed directions thereon. Plaintiff's yellow and black carton inner wrappers as originally issued bore the printed words: "Blue Dots For Sure Shots." "Always Look For The Blue Spot! It Is Your Protection Against Damaged Bulbs. Do Not Use Bulbs If The Spot Is Pink. Keep Bulbs In Sleeve Until Ready To Fire." The later issues of these inner wrappers were barren of this wording. Similarly, on plaintiff's old green and white cartons and inner cartons originally appeared the printed words: "The Only Flashbulbs With The Safety Spot." Later issues of the cartons and inner cartons of these colors did not bear this legend.

Flash" (Trade-Mark 343,849, registered Mar. 9, 1937, Exhibit P-88), although Wabash continued to use the cobalto-cobalti cyanide circular blue dot about one-eighth inch in diameter located at the top end of its bulbs opposite the base until Wabash sold its business to Sylvania at the end of 1945. Commencing apparently in October, 1940 (according to photostatic copies of pages from various magazines devoted to photography which are in evidence as exhibits in this case), Wabash pursued a campaign of advertising of its flash bulb products in which the blue safety spot was emphasized as an important feature of Wabash Superflash bulbs.[4] When Sylvania took over the business of Wabash it continued to advertise "Superflash" bulbs over the name "Wabash—First in Flash—Sylvania Electric", stating that the producer was "Wabash Corporation, a subsidiary of Sylvania Electric Products, Inc."[5] In later direct advertising by Sylvania (after its application for but before the granting of its registration of the blue dot trade-mark) and during its sponsorship of its television advertising program entitled "Beat The Clock" there was still no treatment of the blue dot feature of its flash bulbs as a common law trademark.[6]

### Use of the Blue Dot

The evidence in this case conclusively indicates that the spot of cobalto-cobalti cyanide used by Philips, Wabash and Sylvania, respectively, in their photoflash bulbs was functional, i. e., it clearly served as a check upon the sufficiency of evacuation of air from the bulb during the process of its manufacture and as a warning to the consumer of leakage of the outside atmosphere into the bulb. As recently as the January 1951 issue of "United States Camera" (at page 7, Exhibit D-23) appeared an advertisement by Sylvania stating that the blue dot on one of its bulbs means that

4. For example, on page 81 of the October, 1940 issue of "Minicam Photography" (Exhibit P-5) we find a picture of a Wabash bulb with a human finger pointing to the safety spot, and, included in the text of the advertisement, the following statement:
"When you buy a flash bulb—whatever its size, shape or power—look for one thing—a blue spot on its end! If it has that blue spot—you can be sure of three important things: (1) It's a *fresh* flash bulb! (2) It's a *safe* flash bulb! (3) It's a Wabash Superflash bulb! Because that blue spot is the famous Wabash Superflash Safety Spot. Its blueness indicates freshness * * * usability. This blue turns to pink should the bulb develop imperfection. It's a visible signal of safety for you! And because that blue safety spot indicates a Wabash-made bulb, you can be sure that you're getting each and every flash bulb feature for which Superflash bulbs are so famous: genuine hydronalium all-wire element, extra long peak light flash, split second synchronization, uniformity and dependability of flash, perfection for use with all cameras, synchronizers, reflectors!"

5. In Sylvania's advertisement on page 167 of the November, 1946, issue of the magazine "Popular Photography" (Exhibit D-19) the only reference to the safety spot reads as follows:
"Superflash bulbs are safety-coated for your protection, and the patented blue 'Safety Spot' on each bulb tells you at a glance that the bulb is ready to flash. No more wasted shots due to faulty bulbs! For utmost dependability use Superflash bulbs!"

6. At page 29 of the January 1951 issue of "Modern Photography" (Exhibit D-22) Sylvania advertises its new 10-bulb "Pocket-Pak" of "Superflash" flash bulbs, pointing out that this pocket pack is handier to buy, handier to carry and handier to use. The advertisement also carries an exhortation to "Watch new Sylvania TV show! 'Beat the Clock' Funniest show on TV today! You'll roar with laughter at the side-splitting antics when members of the audience try to 'beat the clock' with their stunts. Don't miss it!" The advertisement concludes in emphasis of four utilitarian features of the new "Pocket-Pak." These four features include a reference to the blue dot in the following language. "Blue dot: Means bulb is ready to use. If dot has turned pink, your dealer will replace bulb free." At the foot of the advertisement is Sylvania's name "Sylvania Electric" separated by a black inverted triangle bearing the letter "S" traversed diagonally in the rear by the representation of a bolt of lightning.

the bulb is ready for use and if the dot has turned pink the bulb will be replaced by the dealer without charge. A feature of goods is functional if it affects "their action or performance or the facility or economy of processing, handling or using them; it is non-functional if it does not have any of such effects." Restatement of the Law of Torts § 742; James Heddon's Sons v. Millsite Steel & Wire Works, 6 Cir., 1942, 128 F.2d 6, 13, certiorari denied 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541; West Point Manufacturing Co. v. Detroit Stamping Co., 6 Cir., 1955, 222 F.2d 581, certiorari denied 350 U.S. 840, 76 S.Ct. 80.

The color and position of the blue dot as employed by Sylvania and its predecessor are also functional features of their flash bulbs. The color variations manifested by the cobalt salt under the respective presence and absence of moisture in the surrounding gas are inherent characteristics of the substance and essential to its function as an indicator. The color of the spot denotes the condition of the bulb. The situation is suggestive of that presented in Diamond Match Co. v. Saginaw Match Co., 6 Cir., 1906, 142 F. 727, certiorari denied 203 U.S. 589, 27 S.Ct. 776, 51 L.Ed. 330, in which manufacture and sale of matches having two-color heads were held not constituting unfair competition, although the colors were similar on the products of both parties. The functional character of the two-color feature was emphasized by the Court in concluding against unfair competition in the following language, 142 F. at page 729:

"The head of two colors is in no proper sense a part of the dress of the match; it is a part of the match itself. In use the tip must be distinguished from the head, for the match should be struck on the tip and not on the head. The claimed improvement lies in thus striking and igniting it. Whoever, therefore, has a right to make a tipped match, has a right to put on it a head of two colors, so as to distinguish the tip on which the match should be struck, from the head itself. The two colors, therefore, serve not only a useful purpose but an essential function, for the very essence of the tipped match is the tip itself, which must be marked out by a color of its own. The head and tip thus distinguished, each by its own color, is therefore a common characteristic of all tipped matches, and to say that no one but the complainant shall make tipped matches with such characteristic is to say that no one but the complainant shall make tipped matches. * * * The characteristic is not specific, but generic, and properly applies to all tipped matches. * * * Sometimes a color, taken in connection with other characteristics, may serve to distinguish one's goods, and thus be protected by the courts [citing cases]; but, as a rule, a color cannot be monopolized to distinguish a product [citing cases]." Cf. Campbell Soup Co. v. Armour & Co., 3 Cir., 1949, 175 F.2d 795, 798, certiorari denied 1949, 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518.

So also a colored round label affixed to the circular center of a circular disc record was held not susceptible of attaining trade-mark status because, as the Court stated, "All that has happened is that a functional part of the record has been colored, not that a design has been achieved." Radio Corporation of America v. Decca Records, D.C.S.D.N.Y.1943, 51 F.Supp. 493, 495.

This Court concludes that the position of the blue dot is also functional. The blue dot is both a warning signal and an assurance of fitness and safety. The condition of the flash bulb is revealed by an inspection of the color of the dot. The facility with which the color of the dot may be observed is greatly enhanced by the prominence of its location. No position of the dot on a bulb of the size and shape of the products with which we are here concerned is more favorable to ready and prompt observation of its color than that employed by each of the

corporate litigants in this case. The efficacy of the indicatory function of the dot is proportionate to the readiness with which it may be observed in the course of handling by manufacturer, retailer and ultimate consumer.

### Meaning of Blue Dot

Because we must conclude that the use of a spot composed of cobalto-cobalti cyanide in an electric photoflash lamp performs the two-fold utilitarian function herein previously described, and because the use of that substance for those purposes has been unrestricted by any patent monopoly at least since the expiration of the Van Liempt patent on January 29, 1952 (35 U.S.C.A. § 154), we confront the question whether, through the use of that substance for that purpose in the form of a circular blue dot about one-eighth inch in diameter located at the top end of the bulb opposite the base in the products of plaintiff and its predecessors, the blue dot has acquired the secondary meaning of a symbol of the manufacturer, relied on generally by the consuming public as a means of identifying the product as that of the plaintiff. The Court concludes that this question must be answered in the negative for reasons hereinafter set forth.

"To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to 'Who makes that article?' In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it." West Point Mfg. Co. v. Detroit Stamping Co., 6 Cir., 1955, 222 F.2d 581, 595, certiorari denied 1956, 350 U.S. 840, 76 S.Ct. 80, citing Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 7 Cir., 1943, 133 F.2d 266, 270.

In other words,

"To establish secondary meaning, the article itself must be so clearly identified with its source that its supply from any other source is clearly calculated to deceive the public and lead it to purchase the goods of one for that of another." Zangerle & Peterson Co. v. Venice Novelty Furniture Mfg. Co. (supra).

To support an inference of a secondary meaning of a trade name, the name "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73.

Despite the large number (over sixty) of consumers of plaintiff's photoflash bulbs who testified on the trial and by pretrial deposition respecting their interpretation of the significance of the blue dot. appearing on the individual bulbs, the substance of their testimony may be reasonably interpreted as indicative that they were all induced to purchase the Sylvania bulb because it had the advantageously functional feature of the blue dot rather than because the bulb was made by Sylvania. These witnesses had been conditioned, by effective and compelling advertising which included both that in printed periodicals and in the form of a fascinating and long continued television program, to understand and appreciate the purpose and function of the blue dot upon a photoflash bulb as an advantageous feature of the product and at the same time they were made aware that this product was that of Sylvania. There is expressed as well as implicit in the testimony of all of these witnesses the readily discernible fact that they were induced to buy these bulbs not because they were made by Sylvania, but because they bore a blue dot and therefore possessed the advantageous features previously referred to.

In the language of Chief Judge Forman in Q-Tips, Inc., v. Johnson & Johnson, D.C.D.N.J.1952, 108 F.Supp. 845, 863, affirmed 3 Cir., 1953, 206 F.2d 144 certiorari denied 1953, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377;

"The test for deciding whether an arbitrary name has become the generic title of a product is 'What do the buyers understand by the word for whose use the parties are contending? If they understand by it only the kind of goods sold, then * * * it makes no difference whatever what efforts the plaintiff has made to get them to understand more.' Bayer Co. v. United Drug Co., D.C.S.D.N.Y.1921, 272 F. 505, at page 509. That case pointed out that to consumers the term 'aspirin' meant only a product, not a manufacturer, and therefore 'aspirin' could not be appropriated as a trademark."

The facts in Bayer are suggestive of those in Smith, Kline & French Laboratories v. Clark & Clark, 3 Cir., 1946, 157 F.2d 725, certiorari denied 1946, 329 U.S. 796, 67 S.Ct. 482, 91 L.Ed. 681, rehearing denied 1947, 329 U.S. 834, 67 S.Ct. 622, 91 L.Ed. 706. The claim of unfair competition in the latter case rested upon similarity of appearance and other features characterizing pills made by the respective parties. Plaintiff, hereinafter referred to as Clark, was charged with manufacturing amphetamine sulphate tablets so closely resembling those made by Smith that they might be substituted for the latter by unscrupulous druggists. The tablets made by neither of the parties bore any identifying name of the manufacturer. Their characteristics are revealed in the description embodied in Chief Judge Biggs' opinion, 157 F.2d at page 730, as follows:

"The single or double scoring of SKF's tablets is functional in order to facilitate the taking of a lesser dosage of a potent drug. The double-scored tablet may be broken into halves or quarters with much greater ease than would be the case if the scorings were absent. The beveled edges, the concavities of the bottoms of the tablets, and indeed the very shape of the tablets, are also functional. Beveled edges prevent crumbling; the concavity of bottoms aids breakage into lesser doses; roundness gives economy of manufacture. * * * Tablets frequently are colored, as for example are some of the defendants' [products], but the natural color of a tablet is white since the inactive ingredient which composes most of its bulk is sugar-milk. The whiteness of tablets therefore is functional."

The Court held that because of these functional characteristics the defendant might with impunity copy them in making and selling its tablets, without being liable to the plaintiff upon the theory of unfair competition.

■ I conclude that plaintiff's use of the blue dot for the obviously functional purposes for which it was originally intended has not clothed it with the secondary meaning of a symbol of plaintiff's manufacture despite the form, amount and financial costs of the advertising by which plaintiff and its predecessor have achieved the consumer appeal which its products now enjoy.

### Blue Dot as Trade-Mark

Can an admittedly functional feature of a product of manufacture acquire, by public acceptation, the character of such a symbol as would constitute a common law or technical trade-mark? Neither the briefs of counsel nor the independent research of the Court has disclosed a judicial decision, based upon facts essentially similar to those presented by the case at bar, which points to an answer, other than a negative one, to this question. In support of their contentions that the blue dot or spot is functional and utilitarian and is not entitled to exclusive appropriation by the plaintiff under the guise of a trade-mark, defendants rely upon James Heddon's Sons v. Millsite Steel & Wire Works, 6 Cir., 1942, 128 F.2d 6, certiorari denied 1942, 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541; Radio Corporation of America v. Decca Records, Inc., D.C.N.Y.1943, 51 F.Supp. 493; Smith, Kline & French Laboratories v. Clark & Clark, 3 Cir., 1946, 157 F.2d 725,

certiorari denied 1946, 329 U.S. 796, 67 S.Ct. 482, 91 L.Ed. 681, rehearing denied 1947, 329 U.S. 834, 67 S.Ct. 622, 91 L.Ed. 706; Remington-Rand, Inc., v. Mastercraft Corp., 6 Cir., 1933, 67 F.2d 218; J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 1941, 120 F.2d 949; and 2 Callmann "The Law of Unfair Competition and Trade Marks" 1032. In the text of the latter writer, we find the principle stated that "The first user cannot claim a secondary meaning on a functional arrangement, nor base any right to a construction or invention on the theory that he had built a business on it 'at large expenditure of money'."

In its efforts to support the validity of the blue dot as a common law or technical trade-mark, despite its functional characteristic, plaintiff relies principally upon Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195; Artype, Inc., v. Zappulla, 2 Cir., 1956, 228 F.2d 695; Q-Tips, Inc., v. Johnson & Johnson, D.C. D.N.J.1952, 108 F.Supp. 845, affirmed 3 Cir., 1953, 206 F.2d 144, certiorari denied 1953, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377; and Capewell Horse Nail Co. v. Mooney, C.C.D.N.Y.1909, 167 F. 575, affirmed 2 Cir., 1909, 172 F. 826. Two further cases in which functional features of non-patented goods were claimed as trade-marks are Vaughan Novelty Mfg. Co. v. G. G. Greene Mfg. Corp., 3 Cir., 1953, 202 F.2d 172, certiorari denied 346 U.S. 820, 74 S.Ct. 34, 98 L.Ed. 346; and West Point Mfg. Co. v. Detroit Stamping Co., 6 Cir., 1955, 222 F.2d 581, certiorari denied 350 U.S. 840, 76 S.Ct. 80. In the Vaughan case, plaintiff manufactured and sold a can opener to which it gave the name "Safety Roll Jr.". Defendant manufactured and sold a can opener substantially identical in design and dimensions with that of the plaintiff with the exception that the handle had hook-shaped openings at each end, whereas plaintiff's product had closed ends with a circular hole in or near each end of the handle. Stamped on the handle of the product of the defendant was the legend "G. G. Greene, War-ren, Pa.". The handle of the plaintiff's opener bore the following legend: "If blade sticks wash in hot water" and the name "Vaughan Safety Roll Jr. Trade Mark Can Opener". In affirming the District Court, 105 F.Supp. 595, the Third Circuit Court of Appeals [202 F. 2d 173], through Judge Staley, recognized the propriety of the trial court's finding that the parts of plaintiff's opener were functional and that "plaintiff's evidence had established only that there was a considerable public demand for a can opener like plaintiff's and that there was no showing that the public purchased it because of its source. Consequently, the court concluded that plaintiff's opener had not acquired a special significance and, thus, that defendant had not violated the [consent] decree" upon which the plaintiff sought an injunction. Judge Staley continues, 202 F.2d at page 173:

"Alternatively, it held that, even were it convinced that plaintiff's opener had acquired a special significance, plaintiff could not prevail because the steps taken by defendant to distinguish its opener from plaintiff's were reasonable and, therefore, legally sufficient."

Further language in the opinion in the same case, 202 F.2d at page 176, is quite directly responsive to the immediate question:

"The defendant's Chinese copy is a result of its imitation of all of the functional features of plaintiff's opener. This is not enough, however, to require defendant to stop making and selling its imitation. The consuming public has an interest in making use of the functional features of plaintiff's opener, superior to plaintiff's interest in being their sole vendor. Since the items copied are functional, defendant has as much right to use them as does plaintiff, even though plaintiff may have been their originator. All that plaintiff may justly demand is that defendant take reasonable steps to prevent buyers of defend-

ant's opener from thinking they have bought plaintiff's."

The Court found that such "reasonable steps" had been taken by the defendant in the form of the lettering which it placed upon its opener and the manner in which its name was printed upon the label, as in Gum v. Gumakers of America, 3 Cir., 1943, 136 F.2d 957. The Court in Vaughan adds, 202 F.2d at page 176:

> "Labeling is often the only reasonable step to take to avoid confusion. To require more is to say in the same breath that defendant may copy because the feature is functional, yet, in order to avoid confusing the source, he may not copy. In design and size the two openers are very much alike but as to the inscriptions thereon they are very different. They are similar where similarity is allowed and different where difference is required. That is enough."

Tested in the light of the criteria above stated, the evidence in the case at bar amply supports the following findings of fact.

The name or designation of neither of the corporate manufacturing parties appears on the respective flash bulbs made by each. Neither did the name of the manufacturer appear on the pillow-like shredded wheat biscuit manufactured by each of the parties in Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73. Any patent rights which may have covered the bulbs of the respective corporate parties, including the use of hydronalium wire and the blue dot, have expired and, therefore, both parties are at liberty to manufacture bulbs with these functional features. The Court finds, however, that the products of the respective parties are readily distinguishable. While the bulb of each manufacturer bears at the same location in the bulb a dot or spot of cobalto-cobalti cyanide, the shape of Dura's bulb is ovate while that of Sylvania's bulb is spherical. The bulbs of each of the corporate par-

ties are usually packaged by the insertion of a group of the bulbs into a cardboard platform or rack which, in turn, is enclosed in a cardboard sleeve. Each rack and each sleeve prominently displays the name of the manufacturer of the bulbs together with the manufacturer's admitted trade-mark i. e., "Superflash" in the case of Sylvania and "Dura Flash" in the case of Dura. The products of both parties are also packaged in cartons. The containers in which the bulbs of each of the parties are packaged, shipped and sold are further distinguishable by reason of shape, size, colors and (in the case of bulbs of the same illuminating power) the number of bulbs contained in the sleeve. I do not overlook the fact that Exhibit P-21, a sleeve of 12 Press 25 Sylvania Superflash bulbs, also carriers the descriptive adjectives "Blue Dot" prominently displayed thereon. However, neither the racks, platforms, sleeves nor cartons of Dura bear any language referring to the blue dot contained in each of its bulbs. While there is testimony in the case that photoflash bulbs with blue dots generally similar in size to the products of both corporate parties have been found on sale in retail stores, unpackaged and in bins, the Court recalls no evidence that any member of the public was misled by the presence of a blue dot on a Dura bulb, despite the testimony of plaintiff's witness Osgood, Supervisor of its Marketing Research and of Fair Trade for its Photolamp Division. From this witness' testimony, we learn that Sylvania sold from 1953 to the date of his testimony approximately 12 million individual flash bulbs in loose cartons and not in sleeves and that these sales were to Eastman, Argus and Ansco, who market camera kits such as those exemplified by Exhibits P-49, P-50 and P-51. In the case of P-49, the kit is composed of one Brownie Kodak Hawkeye camera, flash model, a roll of verichrome pan film, a flash gun with reflector and batteries, and nine flash bulbs having spherical globes with blue dots, to the

Court apparently (by reason of the shape of the globe) the manufacture of Sylvania, but not otherwise individually identified as such. In his capacity as fair trade supervisor for Sylvania, Mr. Osgood testified that he visited a retail camera store in New York City where he found bushel baskets filled with flash bulbs all bearing blue dots. These were advertised at prices lower than those established by Sylvania for retail sale of its bulbs. Upon inquiry, Mr. Osgood was told by the proprietor of the store that these bulbs were "Sylvania Seconds". Knowing that Sylvania had no such product as "Seconds", Osgood purchased a bulb in order to have it identified, and found that it was not a Sylvania bulb. The witness also found bulbs displayed loosely in boxes for sale at a retail camera store in Newark, New Jersey. The witness did not connect the bulbs which he said were not Sylvania bulbs with Dura, and he admitted that one of the criteria which enabled him to distinguish between Sylvania blue dot bulbs of a given size and number and bulbs of other manufacturers was the shape of the bulb. This, of course, is obvious upon comparison of the bulbs contained in Exhibit P–21 with those in Exhibit P–63. The testimony does not afford a basis for inference that the dealer in whose shop the witness found these blue dot bulbs was misled into believing that they were made by Sylvania nor is there any evidence in the case that Dura authorized, expected, intended or knew that its product would be sold as "Sylvania Seconds" by the dealer, if, indeed, they were Dura bulbs, which is not disclosed by the witness' testimony. The conduct of the dealer, if unfair to the plaintiff, is not chargeable to defendants. Swank, Inc., v. Anson, Inc., 1 Cir., 1952, 196 F.2d 330, 332. The evidence is also barren of any basis for inference that any consumer was misled or was likely to be misled into believing that the so-called "Sylvania Seconds" were the product of Sylvania by reason of the presence of the blue dot thereon, the retailer's label embodying the only suggestion in that direction.

Armstrong Paint & Varnish Works v Nu-Enamel Corp., 1938, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195, relied on by the plaintiff, seems clearly distinguishable factually. In that case Nu-Enamel Corp. charged Armstrong with trademark infringement by means of the use of the name Nu-Beauty Enamel upon its products. Plaintiff claimed that the name Nu-Enamel had come to mean plaintiff and its products exclusively. The defendant conceded in its answer that the name Nu-Enamel had come to mean plaintiff and its products and that it distinguished plaintiff's goods from others of the same class, hence no evidence or finding was needed to establish this fact of secondary meaning, and the plaintiff was entitled to protection against the unfair use of the name Nu-Enamel by a competitor seeking to palm off its goods as those of the plaintiff. In Artype, Inc., v. Zappulla, 2 Cir., 1956, 228 F.2d 695, also relied upon by the plaintiff here, we find a differing factual background. The claimed and registered trade-mark was the word "Artype" which was used upon letters, symbols, marks, insignia and similar matter capable of conveying intelligence, applied by various reproducing processes to transparent self-adhering sheets adapted to be cut up for application of desired portions to various advertising. In that case also defendant stipulated that the mark was valid. The defendant, however, a compositor and seller of advertising, did business under the name "Art-Type". In reversing the District Court, which held that plaintiff's trade-mark was invalid because it was descriptive, the Court of Appeals concluded that the name was not so exclusively descriptive of the plaintiff's product that it did not serve to indicate the plaintiff as the source thereof. In the course of its opinion the Court of Appeals, through Judge Learned Hand, said, 228 F.2d at page 697:

"Completely 'descriptive' marks do not ordinarily indicate the source of the goods, but at times they may come to do so, and when they do, they get that 'secondary meaning' which will protect them. Conversely, no care or expense designed to preserve a mark, originally valid, will protect it, if it has in fact come to be only descriptive. On the other hand a mark is not 'descriptive,' though it contains only descriptive syllables, if, taken as a whole, it does not describe the goods to which it is affixed, though it would be 'descriptive,' if affixed to other goods. This is altogether aside from any 'secondary meaning' that it might acquire."

The blue dots on Sylvania bulbs are functional. The name or term "blue dot" which Sylvania places upon its sleeves and cartons and in its advertising is also "descriptive of the goods or of their quality, ingredients, properties or functions." The blue dot is therefore not a trade-mark as defined in § 715 of the Restatement of the Law of Torts.

The name "Q-Tips" used for cotton-tipped medical swabs which was involved in Q-Tips, Inc., v. Johnson & Johnson, D.C.D.N.J.1952, 108 F.Supp. 845, affirmed 3 Cir., 1953, 206 F.2d 144, certiorari denied 1953, 346 U.S. 867, 74 S. Ct. 106, 98 L.Ed. 377, exactly fitted into the definition of a trade-mark set forth in § 715 of the Restatement, viz.:

"A 'trade-mark' is any mark, word, letter, number, design, picture or combination thereof in any form of arrangement, which (a) is adopted and used by the person to denominate goods which he markets, and (b) is affixed to the goods, and (c) is not, except as stated in §§ 720–722, a common or generic name for the goods or a picture of them or a geographical, personal or corporate or other association name, or a designation descriptive of the goods or of their quality, ingredients, properties or functions, and (d) the use of which for the pur-

pose stated in Clause (a) is prohibited neither by legislative enactment nor by an otherwise defined public policy."

The name Q-Tips did not perform or assist in the performance of a function when applied to cotton-tipped medical swabs. Neither was the name Q-Tips descriptive of the product to which it was applied. It was, therefore, a technical trade-mark and subject to the law's protection. The facts in the last cited case are suggestive of those in Dwight S. Williams Co. v. Lykens Hosiery Mills, 4 Cir., 1956, 233 F.2d 398, in which plaintiff's trade-mark "The Railroad Sock" used on the hosiery which it manufactured was held to be infringed by defendant's use of the mark "Trainman" on the hosiery which it manufactured.

Some of the other cases cited by plaintiff are distinguishable by reason of the fact that the asserted trade-mark for which the complaining party sought protection was a name popularly accepted as designative of complainant's product which was threatened by the similarity in sound or spelling of the name under which the party complained of marketed its competing goods. Coca-Cola Co. v. Koke Co., 1920, 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189 ("Coke"—"Koke"); Telechron, Inc., v. Telicon Corp., 3 Cir., 1952, 198 F.2d 903 ("Telechron"—"Telicon"); Industrial Rayon Corp. v. Dutchess Underwear Corp., 2 Cir., 1937, 92 F.2d 33, certiorari denied 1938, 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 ("Spun-Lo"—"Sunglo"); Du Pont Cellophane Co. v. Waxed Products Co., 2 Cir., 1936, 85 F.2d 75, certiorari denied 1936, 299 U.S. 601, 57 S.Ct. 194, 81 L. Ed. 443 ("Cellophane"—"Cellophane"); Bayer Co. v. United Drug Co., D.C.S. D.N.Y.1921, 272 F. 505 ("Aspirin"— "Aspirin"). Although in Capewell Horse Nail Co. v. Mooney, C.C.N.D.N.Y.1909, 167 F. 575, affirmed 2 Cir., 1909, 172 F. 826 defendant contended that the "check-marks" stamped on the beveled face of the head of each of its horseshoe nails served the utilitarian func-

tion of preventing slippage of the nail during a phase of the manufacturing process, the District Court found, 167 F. 575, 581, as follows:

"I am satisfied from the evidence as a whole that the nail in passing between the rollers at this stage of manufacture neither jumps nor slips, and that the use of the gripping surface, other than the rollers themselves, is entirely unnecessary, and that the defendant adopted the gripping surface which produces on the nail the check-mark in question for the purpose of producing a nail which would so closely imitate or simulate complainant's nail that to the eye of the observer the one could not be distinguished from the other, and for the purpose of selling his product on the market as nails of complainant's manufacture."

Such factual finding precludes the conclusion that the "check-mark" was in any degree functional.

As previously stated, the blue dot of cobalto-cobalti cyanide was originated and utilized in a manner similar to that employed by Sylvania and Dura, by Philips, whose flash bulb, so provided with this indicating agent, was covered by Claim No. 1 of the British patent (Exhibit D–134) which embodied the following language:

"1. A flash-light lamp of the kind in which the material producing the actinic light is provided in a closed bulb, wherein the bulb contains as an indicating material a complex cobalt compound which is discolored upon reaction with water vapor."

That patent has expired. When Philips licensed Wabash, the licensor purported to include among the patents under which the license was granted, United States Patent No. 1,989,572, dated January 29, 1935, and herein previously referred to as the "Van Liempt" patent. Claim 12 of the Van Liempt patent also covers the use of this chemical substance as an indicating agent. The language of the claim is as follows:

"12. A flash light lamp comprising a sealed and at least partly exhausted transparent envelope, electric ignition means, and a material within said envelope adapted to be brought by said ignition means to a reaction with actinic effect, and a substance in said envelope, said substance indicating by coloration the presence of air in the envelope."

This patent also has expired. Therefore, the invention described in the quoted claims from each of these patents is and for some time heretofore has been in the public domain. Plaintiff recognizes this fact, but charges that while the defendant may be entitled to use the indicating substance in its bulbs, its employment of a similar location and color constitutes an infringement of plaintiff's trade-mark which could be obviated by placing the indicating substance in a different position in the bulb or by making it with a pigment which would result in a different color sequence than that through which plaintiff's claimed trade-mark is intended to pass. Much testimony and several exhibits were presented descriptive of the manufacturing processes employed by Dura and by Sylvania, respectively, in the manufacture of their bulbs and there was expert testimony tending to indicate that, at a not unreasonable cost, Dura's manufacturing process could be altered so as to place the indicating agent at a different position in the bulb or to employ compounds productive of a different color sequence. It is unnecessary to consider this evidence in deciding this case. This Court finds not only that the use of the blue dot and the compound of which it is composed was an important function of the flash bulb manufactured by plaintiff and its predecessors, but also that the shape and location of this spot (herein previously described) was equally functional, affording the optimum means of presenting the color changes to the observer, whether he be a participant in the manufacturing processes or a consumer of the product. In the flash guns included in

the camera kits previously referred to, the receptacle for the bulb is in the center of a concave circular reflector which is positioned and constructed to reflect the maximum light toward the object to be photographed. This arrangement involves the insertion of the base of the bulb in the receptacle at the center of the reflector so that the end opposite the base of the bulb, being toward the object to be photographed, is the location at which the color of the blue dot is most readily observable. Similarly, in the packaging of the bulbs, as the rack in which the bases of the bulbs are inserted is withdrawn from the sleeve, the location of the blue dot at the top of the bulb opposite the base enables the observer more readily to determine the coloration of the spot. The bulbs in the camera kits are set in cardboard sockets with the top of the bulb toward the observer, again presenting the blue spot at a location most readily observable, and the consumer who removes several bulbs from the rack and sleeve and places them in his pocket or gadget bag for use during this photography, is in a position to observe the color of the blue spot with greatest facility when the spot is located at the top of the glass globe. The process of application of the spot employed by each manufacturer causes the shape of the spot to be roughly circular.

The evidence in the case indicates that when Wabash was licensed by Philips it and its successors, Sylvania believed (as did apparently the parties to the licensing agreement) that the Van Liempt patent covered the blue dot. Accordingly plaintiff and its predecessors so advertised. However, plaintiff subsequently concluded, apparently upon competent advice, that the Van Liempt patent did not cover the blue dot. Defendant contends that plaintiff is estopped to assert noncoverage of the Van Liempt patent, but it is unnecessary to determine whether or not such an estopped exists in view of our finding of coverage as hereinabove set forth.

■■ Plaintiff's registration of the blue dot as a trade-mark does not render it valid as such and its validity may be collaterally attacked in any suit where material. James Heddon's Sons v. Millsite Steel & Wire Works, 6 Cir., 1942, 128 F.2d 6, certiorari denied 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541; Industrial Rayon Corp. v. Dutchess Underwear Corp., 2 Cir., 1937, 92 F.2d 33, certiorari denied 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100. Although registration of the mark creates a rebuttable presumption of its validity that presumption may be overcome by the party challenging its validity. 15 U.S.C.A. §§ 1057 (b) and 1115(a); Rolley, Inc., v. Younghusband, 9 Cir., 1953, 204 F.2d 209. Registration of a trade-mark does not in itself confer any greater rights than existed at common law, for at best it is but a method of recording, for the purpose of serving notice of a claim of ownership, and informing the public and dealers with reference thereto. B. B. Pen Co. v. Brown & Bigelow, D.C. Minn.1950, 92 F.Supp. 272, affirmed 8 Cir., 191 F.2d 939, certiorari denied 343 U.S. 920, 72 S.Ct. 678, 96 L.Ed. 1333.

■ The presumption of validity arising by virtue of the registration of plaintiff's claimed blue dot trade-mark is seriously impaired by the absence from the "Statement" over plaintiff's name, submitted with its application for registration, of any reference to the utilitarian function of the blue dot. No reference to that characteristic is contained anywhere in the file wrapper, contents and drawing in the matter of plaintiff's trade-mark registration application. Because the blue dot formed a useful and functional part of the flash bulb made by plaintiff and its predecessors it is not a valid registerable trademark. Goodyear Tire & Rubber Co. v. Robertson, D.C.Md.1927, 18 F.2d 639, affirmed 4 Cir., 25 F.2d 833; James Heddon's Sons v. Millsite Steel & Wire Works, 6 Cir., 1942, 128 F.2d 6, certiorari denied 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541; Sparklets Corp. v. Walter Kidde Sales Co., Cust. & Pat.App.1939,

104 F.2d 396; In re Winchester Repeating Arms Co., 1934, 69 F.2d 567, 21 C.C.P.A., Patents, 1016. The ultimate burden of proving the claimed validity of its trade-mark rests upon plaintiff. House of Westmore v. Denney, 3 Cir., 1945, 151 F.2d 261.

I conclude therefore that plaintiff's registration of the blue dot as its trademark is invalid.

### Unfair Competition

 Plaintiff here not only claims a valid registered trade-mark but charges the defendants with unfair competition. Despite a finding adverse to this plaintiff respecting the validity of its trade-mark, the charge of unfair competition presents an independent issue which must be resolved under the evidence, without regard to the finding respecting the validity of the trade-mark. Smith, Kline & French Laboratories v. Clark & Clark, 3 Cir., 1946, 157 F.2d 725, certiorari denied 1946, 329 U.S. 796, 67 S.Ct. 482, 91 L.Ed. 681, rehearing denied 1947, 329 U.S. 834, 67 S.Ct. 622, 91 L.Ed. 706. Of course, this Court's adjudication of the invalidity of plaintiff's claimed trade-mark compels the finding that there has been no infringement by the defendants as charged in the complaint. 15 U.S.C.A. § 1114 provides in part as follows:

"(1) Any person who shall, in commerce, (a) use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of [sic] origin of such goods or services; * * * shall be liable to a civil action by the registrant for any or all of the remedies hereinafter provided in this chapter, * * *."

Having determined that the blue dot is not and cannot be a trade-mark of the plaintiff, I conclude that the defendants have not infringed plaintiff's trademark. Diederich v. W. Schneider Wholesale Wine & Liquor Co., 8 Cir., 1912, 195 F. 35, L.R.A.1915B, 889, certiorari denied 232 U.S. 726, 34 S.Ct. 603, 58 L.Ed. 816. In West Point Mfg. Co. v. Detroit Stamping Co., 6 Cir., 1955, 222 F.2d 581, 586, certiorari denied 350 U.S. 840, 76 S.Ct. 80, the controlling rule is stated as follows:

"It is a fundamental rule applicable to all cases of unfair competition that one man has no right to palm off his goods for sale as the goods of a rival dealer, and that he cannot, therefore, be allowed to use names, letters, or other indicia by which he may induce purchasers to believe that the goods which he is selling are the manufacture of another; and this principle is applicable although no technical trademark is used by either. James Heddon's Sons v. Millsite Steel & Wire Works, 6 Cir., 128 F.2d 6 [certiorari denied 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541]. The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another, and if defendant so conducts its business as not to palm off its goods as those of complainant, the action fails. Howe Scale Co. [of 1886] v. Wyckoff, Seamans & Benedict, 198 U.S. 118, 25 S.Ct. 609, 49 L.Ed. 972. Where the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out. Rathbone, Sard & Co. v. Champion Steel Range Co., 6 Cir., 189 F. 26, 37 L.R.A.,N.S., 258."

The general principle underlying unfair competition is stated in § 711 of the Restatement of the Law of Torts, as follows:

"One who (a) fraudulently markets his goods or service as those of another or (b) infringes another's trade-mark or trade name or (c) markets goods with an unprivileged imitation of the physical appearance of another's goods is liable to the other for the relief appropriate under the rules stated in §§ 744–748 * * *."

The evidence in the case at bar fails to support a reasonable inference that the defendants fraudulently market their goods as those of the plaintiff or that the defendants have infringed a trademark of the plaintiff. There remains the question in connection with this principle whether the evidence induces a finding of fact that the defendants are marketing their flash bulbs "with an unprivileged imitation of the physical appearance" of those of the plaintiff. The elements of unprivileged imitation are stated in § 741 of the same Restatement, as follows:

"One who markets goods, the physical appearance of which is a copy or imitation of the physical appearance of the goods of which another is the initial distributor, markets them with an unprivileged imitation, under the rule stated in § 711, if his goods are of the same class as those of the other and are sold in a market in which the other's interest is protected, and * * * (b) the copied or imitated feature has acquired generally in the market a special significance identifying the other's goods, and (i) the copy or imitation is likely to cause prospective purchasers to regard his goods as those of the other, and (ii) the copied or imitated feature is non-functional, or if it is functional, he does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the. other."

In Gum, Inc., v. Gumakers of America, Inc., 3 Cir., 1943, 136 F.2d 957, 959, Judge Maris defines plaintiff's burden in a case for unfair competition in the following language:

" 'Therefore it is apparent that it is an absolute condition to any relief whatever that the plaintiff * * .* show that the appearance of his wares has in fact come to mean that some particular person * * * makes them and that the public cares who does make them, and not merely for their appearance and structure. It will not be enough only to show how pleasing they are, because all the features of beauty or utility which commend them to the public are by hypothesis already in the public domain. * * * The critical question of fact * * * always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward; no degree of imitation of details is actionable in its absence.' " Citing Sinko v. Snow-Craggs Corp., 7 Cir., 1939, 105 F.2d 450; American Fork & Hoe Co. v. Stampit Corporation, 6 Cir., 1942, 125 F.2d 472.

" '[T]he fully established rule is that absent a monopoly right, such as is conferred by ownership of a valid patent or trade-mark, one has the right to copy a competitor's product, even if by so doing he reaps an advantage from his competitor's advertising, provided he does not deceive the public by passing off his product as that of his competitor.' " Swank, Inc., v. Anson, Inc., 1 Cir., 1952, 196 F.2d 330, 332, quoted in West Point Mfg. Co. v. Detroit Stamping Co., 6 Cir., 1955, 222 F.2d 581, 591, certiorari denied 350 U.S. 840, 76 S.Ct. 80.

Applying the criteria expressed in the foregoing quoted language, and having determined that the blue dot on plaintiff's flash bulbs is functional, this Court concludes that the defendants are not guilty of unprivileged imitation of the

plaintiff's goods because (1) the blue dot has not acquired generally in the market a special significance identifying Sylvania's goods, and (2) the imitation is not likely to cause prospective purchasers to regard Dura's goods as those of Sylvania, and (3) the imitated feature is functional, and (4) the evidence clearly shows that defendants have taken reasonable steps to inform prospective purchasers that the goods which Dura markets are not those of Sylvania by means of the shape of the globe of Dura's bulb and the prominent display of Dura's name upon the racks, cartons and sleeves by means of which its goods are marketed. The situation is similar to that which existed in Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, involving the pillow-shaped biscuits used by both parties after the expiration of the covering patent which placed the product within the public domain both as to content and form. It will be remembered that neither Sylvania nor Dura places any name upon the individual flash bulb which it manufactures. Assuming the right of both to avail themselves of the functional advantages of the blue dot because of the expiration of the patent which covered it, it would be equally impractical to expect either manufacturer to place its name upon the individual bulb when it so prominently displays its name and admitted trade-mark upon the packages and containers in which its bulbs are marketed. At most the evidence shows that many purchasers purchase Sylvania bulbs because of the advantage afforded by the blue dot thereon. The use of the substance of which the blue dot is composed for the purposes for which it was originally patented is, in view of the expiration of the patent, open both to Sylvania and to Dura. The Court can find no sufficient evidence in this case from which it may be properly inferred that by using in its flash bulbs the spot or dot which Sylvania uses in those which it manufactures, Dura has palmed off or is likely to palm off its flash bulbs as the product of Sylvania. The Court, therefore, concludes that Dura is privileged to use the blue spot or dot as it presently does, and, therefore, that it is not guilty of unfair competition with Sylvania. Consequently the relief sought by the plaintiff must be denied.

The foregoing opinion shall be deemed to constitute the Court's findings of fact and conclusions of law, and an order in conformity therewith may be presented.